**Rosalind QUAIR, Plaintiff,**

v.

**Mike SISCO, et al., Defendant.**

**No. CVF025891RECDLB.**

United States District Court,
E.D. California.

July 26, 2004.

J. Leah Castella, Tracy Steen, A. Robert Rhoan, Jr., Patrick Romero Guillory, Paul Harris, Elizabeth Hall, Bingham McCutchen LLP, San Francisco, CA, for Petitioners.

John M. Peebles, Monteau & Peebles LLP, Conly J. Schulte, Monteau & Peebles LLP, Christina V. Kazhe, Monteau & Peebles LLP, Charles Antonen, Monteau & Peebles LLP, Omaha, NE, for Respondents.

ORDER GRANTING IN PART AND DENYING IN PART CROSS–MOTIONS FOR SUMMARY JUDGMENT

COYLE, Senior District Judge.

On April 12, 2004, the court heard cross-motions for summary judgment in this consolidated case.[1]

Upon due consideration of the record herein and the written and oral arguments of the parties, the court grants these motions in part and denies them in part as set forth herein.

Quair and Berna (hereinafter referred to as petitioners) respectively are proceeding in this court pursuant a First Amended Petition for Writ of Habeas Corpus pursuant to Title I of the Indian Civil Rights Act (ICRA), 25 U.S.C. § 1301 *et seq.* Petitioners allege that they were members of the Santa Rosa Rancheria Tachi Indian Tribe (hereinafter Tribe) until they were illegally disenrolled and banished by respondents. Respondents Mike Sisco, Elmer Thomas, Kevin Thomas, Dena Begna, Elaine Jeff, Patricia Davis and Does 1–50, all named in their official capacities, are alleged to be enrolled members of the Tribe and are members of the General Council of the Tribe "or were individuals who were given official authority to bring criminal-type charges and cause the disenrollment and banishment of" petitioners. Quair alleges in pertinent part:

6. [T]hat as a result of her complaints of sexual harassment against a male member of the Tribe and her intention to bring an action against him for such conduct, that she was falsely accused of hiring an attorney for the purpose of 'suing the Tribe' at a meeting of the Tribe, on June 1, 2000. In that meeting, Petitioner was falsely accused of 'betray-al' and 'treason' against the Tribe for trying to bring a lawsuit against the Tribe.

Berna alleges that, at the time of her disenrollment, she was the "federally recognized Treasurer of the Tribe" and further alleges in pertinent part:

7. [T]hat at a meeting of the Tribe, on March 31, 2000, she was falsely accused of embezzlement of funds of the Tribe. The false charge and related accusations were in response to Petitioner's request for an outside audit of the finances of the Tribe following that building of a gambling casino on the Reservation. Petitioner, who was the official Treasurer of the Tribe at the time the criminal charges were made against her, was seeking an independent review of unauthorized expenditures of the Tribe made by certain individual members. In an effort to prevent an independent audit of the finances of the Tribe, Petitioner was accused of vague, unwritten, and unsubstantiated criminal charges and recalled as Treasurer of the Tribe at a March 31, 2000 meeting of the Tribe. Petitioner was then disenrolled and banished by Respondents at a June 1, 2000 meeting of the Tribe.

Very generally, petitioners allege that they were denied various procedural and substantive rights under the ICRA in connection with the proceedings resulting in the decision to banish them from the Tribe's reservation. *See discussion infra.* Petitioners further allege:

15. Petitioner has no other remedy at law on in equity because she has attempted to seek relief by way of an appeal to the highest official body of the Tribe, but Petitioner has not been afforded a due process right to redress

---

1. *Charlotte Berna v. Mike Sisco, et al.,* No. CV–F–02–5892 REC/DLB has been consolidated with this action.

her grievances or appeal her disenrollment and banishment. Petitioner is informed and believes that any further attempts to seek redress of her grievances or appeal the criminal charges and penalties against her would be fruitless as the Respondents responsible for her disenrollment and banishment are the same parties who refuse Petitioner's right to redress or to appeal. Petitioner has exhausted all of her remedies with the Tribe and also with the Department of Interior (BIA). If this court does not grant Petitioner's Writ of Habeas Corpus, Petitioner will be left without any possibility of relief from the illegal detention and restraint on her liberty resulting from the illegal criminal sanctions that have been imposed on her.

The petitions seek the following relief: [2]

[T]hat the Court issue an order directing Respondents to discharge Petitioner from their custody and from the detention and restraint on Petitioner's liberty as set forth above; and that the Court issue an order vacating Petitioner's conviction for unspecified criminal charges; an order vacating Petitioner's banishment and removal from membership in the Tribe; an order reinstating the Petitioner's per capita payments and providing for payments retroactive to the date of the illegal disenrollment and banishment; and an order granting such other and further relief as the court deems

just and proper under the circumstances.

Petitioners and respondents move the court for summary judgment.

## A. *Factual Background.*[3]

The Tribe is a federally recognized Indian tribe, with reservation lands located in Kings County, California. Historically, the Tribe's enrollment has hovered around 350 members, although currently the Tribe has over 700 enrolled members (approximately 400 adults and 300 minor children). The vast majority of the Tribe's members either reside on or close to the Rancheria, now comprised of approximately 390 acres. The Tribe owns and operates the Palace Indian Gaming Center, a Class III gaming facility. The revenues from the Palace are distributed according to the Tribe's Revenue Allocation Plan as approved by the Secretary of the Interior. These gaming revenues fund the Tribe's governmental operations and a portion of these revenues are distributed directly to the membership as per capita payments.

The Tribe formally reorganized in 1962 pursuant to the Indian Reorganization Act by adopting the Articles of Community Organization of the Santa Rosa Indian Community. The Articles of Community serve as the Tribe's principal governing document and provide for the establishment of a tribal government, the conduct

---

**2.** Pursuant to the Amended Scheduling Conference Order filed on March 7, 2003, "[i]ssues relating to damages and remedy will be heard after the motions for judgment on the writ."

**3.** Petitioners did not file a Statement of Undisputed Facts in support of their motions for summary judgment. Rather, they filed a Statement of Undisputed Facts at the time they filed their opposition to respondents' motion for summary judgment. Respondents request that the court disregard petitioners' untimely Statement of Undisputed Facts and

deny petitioners' motions for failure to comply with the Local Rules of Practice. The court denies respondents' requests, concluding that petitioners' failure to comply with the rules did not prejudice respondents or prevent the court from a timely and appropriate review. However, petitioners are advised that they are required to timely and fully comply with the Local Rules of Practice, the Federal Rules of Civil Procedure, and court orders. Failure to do so may result in the imposition of sanctions, including the sanction of dismissal.

of tribal elections, qualifications for tribal membership, and the powers of the Tribal Business Committee. Under the Articles of Community, the governing body of the Tribe is the General Council.

The General Council is comprised of the entire adult population of the Tribe. The General Council meets regularly once a month to debate and decide issues involving the Tribe and the Tribe's members. Non-members are not permitted inside the General Council's meetings unless specifically invited by the General Council. Tribal members are permitted to bring their concerns involving the Tribe or individual tribal members to the General Council for discussion and resolution. It is asserted by respondents but disputed by petitioners that tribal members utilize the General Council sparingly because the decisions of the General Council are final under the tribal law and, therefore, any decision issued by the General Council can only be overturned by the General Council. Petitioners assert that the Tribal Business Committee can overrule decisions of the General Council if the General Council exceeds its authority.

The Tribal Business Committee aka the Tribal Council is an elected body comprised of six tribal members. The Tribal Business Committee operates under a granted of limited authority from the General Council. One of the responsibilities of the Tribal Business Committee is to chair the monthly General Council meetings. The Tribal Business Committee prepares the tentative agenda for a General Council meeting and ensures that a quorum is reached before business is transacted by the General Council. Once a General Council meeting is called to order and a quorum is reached, the Tribal Business Committee plays a subordinate role to the General Council. Respondents assert that the General Council is not limited by the meeting agenda prepared by the Tribal Business Committee. Petitioners dispute this, asserting that all General Council meetings where membership is at issue are supposed to be on the written agenda before a vote of the General Council is taken on that issue. The General Council permits tribal members to bring non-agendized issues to the floor of the General Council for decision. Once a non-agenda item is brought to the floor, the General Council may decide either to hear the issue or to postpone it to the next General Council meeting. A typical General Council meeting lasts from four to six hours.

Under the Articles of Community Organization, the General Council sets the rules or procedures for the conduct of its affairs. Respondents assert that the rules and procedures established by the General Council for its own affairs are followed as a matter of customary tribal law and that the General Council conducts its meetings in an open hearing format, where all tribal members are provided with the opportunity to speak. Petitioners dispute this, asserting that it is customary for General Council meetings to be very loud and boisterous, that often no one is in control, people are yelling and tribal business is not attended to. Respondents assert that the General Council utilizes a particular hearing procedure when deciding whether an individual should be excluded from the tribal community. Petitioners dispute this, asserting that respondents have not produced any written procedure for a hearing on disenrollment and banishment. Respondents assert that, if the affected individual is a tribal member, he or she is notified that the General Council will be deciding whether to exclude him or her from the tribal community. Petitioners dispute this, asserting the lack of a written procedure and further asserting that petitioners did not receive any notice that there would be a vote to disenroll and banish them. Respondents assert that

this notification may be in writing but can also be delivered orally. Petitioners dispute this, asserting that respondents have produced no written procedures regarding notice and again asserting that they received no notice. Respondents assert that a tribal member(s) will request that a specific individual be excluded and, if a tribal member, he or she is then given the opportunity to address the General Council. This is disputed by petitioners and will be discussed *infra*. The potentially excluded tribal member may request the Chairman of the Tribal Business Committee to read some remarks to the General Council on their behalf. Respondents assert that after hearing these statements, the General Council debates the merits of whether the particular individual should be excluded from the tribal community. Petitioners dispute this, contending that the debates consist of the loudest tribal members yelling out their positions and aggressively calling for issues that they want voted on, that many times people are shouted down when they are trying to speak and that their views are not heard by the General Council. Respondents assert that the debate by the General Council is quite vigorous, with tribal members weighing in on both sides of the issue and that, upon the conclusion of the debate, the General Council will vote by a show of hands as to whether the individual should be excluded. Petitioners dispute this, asserting that there is no procedure employed by the Tribe to ensure that petitioners received any kind of fair hearings and that many General Council meetings are characterized by yelling and screaming, as was the case with petitioners' disenrollment, banishment and appeals.

Respondents are current and former members of the Tribal Business Committee. Petitioners are former members of the Tribe. Charlotte Berna has not resided on or adjacent to the Rancheria since 1970. Rosalind Quair rented a dwelling from the Tribal Housing Authority located on the Rancheria from 1989 until 2001. Neither petitioner held an individual allotment to tribal lands located on the Rancheria.

Respondents assert that petitioners were informed in May, 2000 that their suitability for membership in the Tribe was going to be decided at the June 1, 2000 General Meeting. As noted, petitioners dispute this, asserting that they were not given any notice that there would be a vote to disenroll and banish them at this meeting.

In 1998, Charlotte Berna led the successful recall by the General Council of three members from the Tribal Business Committee, accusing these individuals of mismanaging the Tribe's assets and embezzling the Tribe's money during their terms on the Tribal Business Committee. After the recall, Berna was elected Treasurer of the Tribal Business Committee. While Treasurer, Berna initiated an unsuccessful campaign to strip the recalled individuals of their tribal membership and ban them from the Rancheria. Berna then launched a "fraud investigation" targeting the recalled individuals and their families. The preliminary results of the fraud investigation were released in April 1999, finding that several tribal members were in violation of the Tribe's Living Expenses Assistance Program (LEAP). Based upon these preliminary findings, eight tribal members received letters from Berna permanently suspending them from the LEAP program. It is asserted that during this period, the General Council became concerned about Berna's handling of tribal assets, particularly regarding her making house payments for family members out of tribal funds and regarding the discovery that the Children's Trust Fund was underfunded by approximately $247,000. It is asserted that due to these

concerns, "along with a variety of other issues", Berna was recalled from the Tribal Business Committee in March 2000. Berna disputes these facts, asserting that she was recalled and terminated from her employment without cause and without a determination whether she had misused tribal funds.

In the Spring of 2000, petitioners retained an attorney, Paul Henry Abram. Mr. Abram had a long and bitter history with the Tribe and was seeking to enforce a multi-million dollar judgment against the Tribe, various tribal officials and tribal members. On May 19, 2000, Mr. Abram sent a letter to Clarence Atwell and fourteen other tribal members, which letter states in pertinent part:

> This letter is . . . to inform you and the Tribal Council that I represent Ms. Charlotte Berna, the 'Former treasurer' . . . I have records, minutes of meetings, by-laws and video tape, all of which unequivocally prove her wrongful removal and termination as Treasurer. I shall also pursue her claims of sexual, racial and medical disability discrimination as well as retaliation against her for properly reporting tribal member fraud and embezzlement.
>
> . . .
>
> . . . I also represent Rosalynd [sic] Quair in her claims against you and others for employment discrimination based on race, sex and medical disability
>
> . . . .
>
> It occurs to me that all of the above might be construed by some (perhaps financial institutions such as Sierra Bank and/or Miller & Schroeder, or the State of CA in reference to Proposition 1A, not to mention other 'Indian Tribes' as to Prop. 1A 'Compact' is negotiated) as signs of an 'unstable tribal council' at your Rancheria.
>
> Prior to these matters becoming a full-blown media event—writs, levys, orders for appearance of judgment debtors, etc. are all matters of public record—it would seem prudent that we meet, within thwe [sic] next 48 hours, to discuss an amicable resolution . . . . .

Abrams' letter generated concern. A flyer dated May 19, 2000 was issued, stating:

> *To Concerned Tribal Members*
>
> Today, Attorney Paul Abram has informed the Tribe that he is representing Charlotte Berna . . . and Rosalynd Quair in Lawsuits against the Tribal Council and others.
>
> Charlotte Berna went to the same Attorney who has tried over and over to make our Tribe look bad. The Attorney Paul Abram now has some of our *own Tribal Members* providing him with information about personal politics and Tribal Government issues. As stated in the attached letter, Mr. Abrams states; 'I have records, minutes of meetings, by-laws and video tape'. Also stated in the Letter, Mr. Abram indicates that we have an 'unstable tribal council.' Remember, Charlotte Berna was the tribal council. As a concerned Tribal Member, don't you want to know who gave our Tribal Government information to this Attorney?
>
> With the assistance of our own tribal members, Mr. Abram also had mention [sic] in the attached letter that these matters may become a *FULL–BLOWN MEDIA EVENT*.
>
> If you want more information, please show up at the Multi–Purpose Building on Monday morning at 10:00 a.m. for a Special General Council meeting. Please inform family members residing off the Rancheria about the Special Meeting.

After several impromptu meetings of tribal members, a consensus was reached that petitioners needed to come before the Gen-

eral Council to explain their actions at the June 1, 2000 meeting.

According to respondents, a letter was drafted by Tribal Administrator, Craig Marcus, which was signed by Chairman Atwell, advising petitioners that they "needed to be present at the June 1, 2000 General Council meeting because their tribal membership was subject to revocation and they could be excluded from the community." As noted, petitioners dispute that they received any notice that their disenrollment and banishment was to be considered at the June 1, 2000 meeting. No signed copies of these letters have been provided to the court. Respondents assert that, after receiving these letters, petitioners, along with their families, came to the tribal offices to speak with Craig Marcus. Marcus told petitioners that it was important for them to be at the General Council meeting and to encourage their family members and supporters to attend.

Again, petitioners dispute receiving any such notice. However, petitioners must have had some notice that their actions were going to be discussed at the June 1, 2000 General Council meeting because both petitioners submitted statements which were read at the June 1, 2000 General Council meeting. Charlotte Berna's statement is as follows:

> AS YOU ALL KNOW, ON MARCH 31st I WAS SUSPENDED FOR 30 DAYS AS TREASURER WITH NO PAY. AN ILLEGAL VOTE WAS DONE THEN AFTERWARD A GROUP OF PEOPLE CALLED IT A RECALL. THIS INCLUDING THE ELECTION WAS INVALID AND YET CLARENCE ATWELL LET IT HAPPEN. AT THE NEXT MEETING, MAY 1, 2000, CLARENCE SAID HE WAS RE–INSTATING ME BACK TO WORK AND HE ALSO TOLD ALL THE ELDER'S [SIC] THE SAME THING. AGAIN CLARENCE WENT BACK ON HIS WORD AND SEATED THE NEW TREASURER IN. THERE WAS NO QUORUM BUT STILL HE PROCEEDED WITH THE DECISION OF SEATING THE NEW TREASURER.
>
> I CALLED EVERYWHERE IN THE PHONE BOOK TO SEE IF I COULD FIND AN ATTORNEY TO REPRESENT ME WITH MY CASE. I DIDN'T KNOW THAT THE ATTORNEY I HAVE NOW WAS THE SAME ATTORNEY WHO FILED A SUITE [SIC] AGAINST CLARENCE AND OTHERS. I DIDN'T EVEN KNOW THAT THIS ATTORNEY WAS WORKING ON THIS OLD CASE AGAIN. NOW I AM BEING BLAMED FOR THINGS THAT THE ATTORNEY PUT IN THE PAPER AMONG OTHER THINGS. I AM ALSO BEING BLAMED FOR ROSALINDA [SIC] HAVING THE SAME ATTORNEY. AGAIN I HAD NOTHING TO DO WITH THAT AND I DIDN'T EVEN KNOW ABOUT ROSALINDA UNTIL THE ATTORNEY SENT ME A COPY OF A LETTER SENT TO THE ATTORNEY'S [SIC] FOR THE TRIBE STATING THAT HE WAS REPRESENTING US.
>
> I HAVE ONLY MET WITH THIS ATTORNEY ONCE AND STILL HAVE TO DISCUSS WITH HIM ON THE MATTER OF MY LAW SUITE [SIC] SO THAT I CAN FIND OUT WHAT IS GOING ON. ALL I KNOW IS THAT THE ATTORNEY STATED THAT ANY INFORMATION HE MAY HAVE NOW WAS BY PUBLIC RECORD. I DID NOT GIVE THIS ATTORNEY ANY INFORMATION ON THESE OTHER PEOPLE.
>
> AND JUST IN CASE EVERYONE HAS FORGOTTEN, WE ALL RECEIVE MINUTES AND HAVE COP-

IES OF THE BI–LAWS [SIC] AND IN ORDER TO HAVE ANY ATTORNEY REPRESENT ME FOR THIS CASE OF *WRONGFUL TERMINATION* I HAD TO GIVE THESE TO HIM SO THAT HE CAN UNDERSTAND MY CASE AS A PREVIOUS EMPLOYEE. THIS IS ALL I HAVE TO SAY ON MY BEHALF AS A TRIBAL MEMBER.

IF GENERAL COUNCIL HAS ANY OTHER QUESTIONS REGARDING ANY MATTERS WITH MY ATTORNEY YOU CAN CONTACT HIM AT 583–9527. YOU CAN ASK FOR PAUL HENRY ABRAM.

Roselind Quair's statement is as follows:

TO ALL THE TRIBAL MEMBERS; I, ROSELIND QUAIR, AM NOT SUING THE TRIBAL MEMBERS. I AM SUING ONLY THE PEOPLE WHO ALLOWED A WRONG TO BE DONE TO MYSELF AND OTHERS. I WANT YOU TO KNOW THAT CHARLOTTE BERNA DID NOT HELP ME TO GET MY LAWYER. TO CLEAR UP THIS SCANDAL ABOUT CHARLOTTE BERNA, THE COLLEGE HAD SEEN WHAT I WAS GOING THROUGH IN MY PERSONAL ANGUISH. MY COUNSELOR HELPED ME RETAIN MY LAWYER. I HAVE THE RIGHT TO DO WHAT IS RIGHT. I AM PERSON [sic] JUST LIKE EVERYONE ELSE. JUST BECAUSE I AM IN WHEEL–CHAIR DOES NOT MEAN I DO NOT HAVE A MIND OF MY OWN. I WILL CONTINUE TO DO WHAT I MUST DO. IF I DO NOT, SOMEONE ELSE MAY THINK THEY ARE FREE TO ABUSE ONE OF YOU HERE ON THE RANCHERIA.

The Agenda for the June 1, 2000 General Council meeting listed as item 7 "Membership/Housing Issues: Sharon Fernandez (at her request)."

Quair appeared at the June 1, 2000 General Council meeting. Chairman Atwell read Quair's statement at the meeting. Quair was given the opportunity to address the General Council. However, according to one of the sets of handwritten minutes provided to the court, "Council was letting Roselind to speak but she couldn't". Berna also appeared at the June 1 meeting but left the meeting before the General Council discussed whether she should be excluded from tribal membership and the community. Berna's letter was distributed to the General Council.

The court has been provided with two different handwritten minutes from the June 1, 2000 General Council meeting. The court is not advised of the identities of the persons taking the handwritten minutes. One set of handwritten minutes is attached as Exhibit B to the Declaration of Mary Jane Varela. At oral argument, respondents provided the court with another handwritten copy of the minutes of the June 1, 2000 meeting (Bates Nos. 1124–1132). Also at oral argument, respondents provided typewritten minutes. However, the court is not advised whether these are the official minutes of the June 1, 2000 General Council meeting or the identity of the secretary.

In all three versions of the minutes, it does not appear that a motion was made and/or a vote taken to disenroll either petitioner at the June 1, 2000 meeting. A motion was made and carried to have the tribal attorney draft a resolution to do so to be presented at the next General Council meeting. Motions were also made and carried to countersue the petitioners and to obtain an order restraining them from all tribal businesses. Although votes were taken to ban tribal members, Chris Herrera, Johnny Castro, and Matt Maldonado, effective June 1, 2000, no such votes with respect to petitioners is described any-

where in any of the minutes. Furthermore, none of the minutes provided to the court reflect that Berna's statement to the General Council was read to the General Council. Petitioners dispute that there was a discussion and debate "consistent with due process", asserting that yelling and screaming ensued after Atwell read Quair's statement and that a vote was hurriedly taken without any true deliberation of any kind.

On June 20, 2000, Berna sent a memorandum to the Tribal Council entitled "Reinstatement of Membership" in which she stated:

> I don't know what is going on, but I have been told that I was disenrolled and banned from the reservation. I have not received a letter from council or membership. So Clarence what is going on?
>
> I did not give that attorney anything regarding the children's trust I only asked him if he could file a suite [sic] against certain individuals not the tribe for wrongful termination, harassment and discrimination against me. I also did not know that Linda have been recommended to the same attorney. And I didn't even know that this attorney was the same one that represented the sheriffs and was after you and others.
>
> Is this legal cause to be disenrolled as a tribal member and if so then why are these other tribal members who have stolen from the tribe not been disenrolled? Please contact me right away to that I may sit and talk to the council regarding this matter.

Berna sent another memorandum dated June 23, 2000 to the Tribal Council regarding "Tribal Membership" in which she stated in pertinent part:

> At the General Council meeting on June 1, 2000, I was told that I had been disenrolled from membership. The only problem is that this was by hear say only. I still have not been properly served with a letter by council or the membership committee stating that I have been disenrolled.
>
> I will be expecting my percapita check and L.E.A.P. payment on July 1, 2000. If there is a conflict regarding this matter, I would appreciate something in writing.

By letter dated July 25, 2000 from the Membership Committee to Berna, it was stated: "We the Membership Department would like to apologize for the inconvenience that was caused regarding the letter you have not received. Enclosed you will find a copy of the previous letter." The previous letters referred to are dated June 29, 2000 from the Membership Department and state in pertinent part:

> We the Membership Department would like to inform you that as of June 1, 2000 you were banned and disenrolled as a tribal member based on majority vote of the General Council. You are no longer entitled to any benefits or royalties of the Santa Rosa Rancheria.
>
> If you have any questions or concerns you can contact membership at 925–1847.

Respondents assert that petitioners attempted to appeal the General Council's disenrollment and exclusion decision to the Tribal Business Committee and to the Tribal Membership Committee, that both of these committees advised petitioners that these committees lacked the authority to reverse a decision of the General Council and that petitioners' only recourse was to bring a petition directly to the General Council. Berna disputes that she attempted to appeal to these committees but Quair does not. Quair disputes that she received notice of how to appeal the decision of the General Council but Berna does not.

Petitioners each gathered signatures from tribal members on petitions to rein-

state them as members of the Tribe. On October 5, 2000, Berna addressed a "Letter of Appeal for Re–Instatement of Membership" with an attached "Petition for Re–Enrollment of Membership" to the Membership Committee. The attached petition states in pertinent part:

I Charlotte Berna ... is hereby presenting this petition for re-enrollment of my membership. I have been disenrolled by the membership committee without Clarence Atwell's signature and have been disenrolled by false accusations by certain individuals from the tribe. I have dropped the law suit against Clarence Atwell and the committees. This was not a law suit against the tribe. Certain individuals on this committee plotted to have me removed as Tribal Treasurer under false pretenses. The people who should be disenrolled by law, should be the ones who have been indicted with a crime, not just because certain people don't like one another.

The petition as the signatures of 104 individuals. Berna's Letter of Appeal to the Membership Committee states:

I am appealing my membership with the Santa Rosa Rancheria as a tribal member of the Tachi Tribe. I am asking membership that my re-instatement be granted today as a tribal member, giving me back all my rights. I was treated very unfairly by certain individuals within the tribe and feel that I should have the right to speak on my behalf.

I feel that I was wrongly terminated by these same individuals for their own personal reasons. I called every attorney in the yellow pages and happened to speak with Paul Abram who agreed to represent me, without my knowledge of who else he was representing. I did not know that Paul Abram was persuing [sic] Clarence Atwell and the others. I also didn't know that Mr. Abrams was representing the sheriffs or Linda Quair.

When I first spoke to Paul Abram, I had told him that I wanted to file a suite [sic] on certain individuals for harassment, discrimination and wrongful termination. I let it be known to Paul Abram that you could not sue the tribe because of soverrnty [sic] and he agreed with me. I also let him know that the tribe did not have anything to do with what was going on, that it was just a small group of tribal members. Later I found out that someone was spreading rumors to other tribal members that I was suing the tribe, which held no truth to it. I didn't know what was going on until everyone told me that I had been disenrolled. I did not receive a letter from the membership until July 25, 2000 stating that I had been disenrolled and realized that there was no signature on the letter from the tribes [sic] chief, Clarence Atwell.

I want it to be known to membership that I no longer have this attorney or any other attorney regarding this matter and there is no law suite [sic]. So I come to you (membership) asking that I be re-instated as a tribal member with all my rights back.

Please take this into consideration, everyone deserves a second chance. I have become a great burden on all my family members because they keep trying to help me pay my bills every month. I don't want to be a burden to them anymore, I just want another chance to get my rights back as a tribal member and clear my name from all the slander these individuals have spread to other tribal members.

Quair's statement of appeal and attached petition signatures, numbering 131, is dated October 2, 2000 stated in pertinent part:

I Roselind Quair is here today to reinstate all my rights as a trible [sic] be-

cause I have the law suit drop [sic], I had call the auttorney [sic] to drop everything. ON [sic] July 24, he as out of town so I had to waite [sic] for him to get back in town so it was on Aug. 3, 2000 I had drop the low [sic] suit I was not trying to hurt the tribe in any way. I have family that are trible [sic] members, do think I want to hurt them or others [sic]. Clarernel [sic] said he didn't see the letter that was sent to him. Sone eles [sic] got it, made copies and put a copy in everyones [sic] mail box.. but no one in my family didn't get one [sic]. This person didn't have any right to open someone eles [sic] mail. I don't know much about trible [sic] rights or the laws. I feel I'm not the only one has done wrong [sic]. There are others who has done wrong and still gets another chance [sic]. I am human to [sic] I feel that have a second to chance to like everyone eles did [sic]. I don't have the kind of income or insurce [sic] for all my meds that I need to take everyday. It is hard for me to get a job and still going to school. How would to be in my place and feel what I have been going through for the last 3 months [sic].

I feel I am still a member because I have not received any legal letter saying I am not no longer a member [sic]. I want to thank all of those who sign my petion. [sic]

Petitioners requested that their petitions for reinstatement be placed on the General Council's meeting agenda. The petitions for reinstatement were placed on the agenda for the October 2, 2000 General Council meeting under the heading "appeals".

Petitioners appeared at the October 2, 2000 General Council meeting. However, they were required to leave by order of the General Council before the General Council voted on Resolution 00–27. The record does not indicate whether the writ-

ten appeals/petitions were presented to the General Council. At the October 2, 2000 General Council meeting, several tribal members made motions to reinstate petitioners as members of the Tribe. The General Council voted 34–29 to reaffirm the prior determination that petitioners were not suitable for membership. The General Council also voted to approve General Council Resolution No. 00–27, captioned "Authorizing the Tribal Council to Exclude Charlotte Berna and Rosalinda Quair from the Rancheria". Resolution No. 00–27 states in pertinent part:

WHEREAS: The General Council has determined from reliable sources of information that Rosalinda Quair and Charlotte Berna have acted in a manner that is to the detriment of the Tribe, and

WHEREAS: Among the Tribe's governing power is the power to exclude from the Rancheria persons whose conduct or activities have harmed or threatened to harm the health, safety or welfare of the Rancheria community as a whole and/or individual members of our community; and

WHEREAS: the right to protection of our land through actions of ejectment, trespass or similar possessory suits is well-settled law, being affirmed early and throughout the United States jurisprudential history . . .; and,

WHEREAS: 'a tribe's power to exclude nonmembers entirely or to condition their presence on the reservation is . . . well established' . . . .

WHEREAS: The General Council has adopted an Ordinance in furtherance of the Tribe's right to exclude tribal members and non-tribal members from the Rancheria; and,

WHEREAS: The General Council has authorized the Tribal Council to do whatever is necessary to prevent Char-

lotte Berna and Rosalinda Quair from entering the Rancheria,

NOW THEREFORE BE IT RESOLVED: that Charlotte Berna and Rosalinda Quair are permanently excluded and banished from the Santa Rosa Rancheria, as the General Council has found that the continued presence on or return to our Rancheria by Charlotte Berna and Rosalinda Quair constitutes a clear, present and extremely serious danger to the health, safety and welfare of the entire Rancheria.

NOW THEREFORE BE IT FURTHER RESOLVED: that our Tribe's Chairman, the Honorable Clarence Atwood is authorized and directed to act in the Tribe's best interest and to take any and all actions at law in order to protect our Rancheria and is authorized to sign any kind and all legal documents on behalf of the General Council.

BE IT FURTHER RESOLVED: that Charlotte Berna and Rosalinda Quair are hereby ordered immediately and permanently excluded from entering or remaining within the exterior boundaries of the Santa Rosa Rancheria, and is declared to be a trespasser.

Atwell resigned as Tribal Chairman at the October 2, 2000 meeting prior to the adoption of Resolution 00–27. By Notice dated October 16, 2000, Mike Sisco, on behalf of the Tribal Council, issued the following notice to Tribal Security:

RE: EVICTIONS OF PERSONS OFF RANCHERIA BOUNDARY

1. CHARLOTTE BERNA

2. ROSALINDA QUAIR

Santa Rosa Rancheria General Council has voted and approved to have these named individuals removed from the Rancheria effective this day Monday, October 16, 2000. By order of the Santa Rosa Rancheria Tribal Council the Tribal Security Department is requested to evict these individuals.

Respondents state in their answers to interrogatories that Berna was disenrolled and banished "for privacy violations, misuse of Tribal assets, undermining Tribal government and defaming the Tribe" and that Quair was disenrolled and banished "for privacy violations, undermining Tribal government and defaming the Tribe."

**B.** *Indian Civil Rights Act, 25 U.S.C. § 1301 et seq.*

Section 1302 provides that no Indian tribe in exercising powers of self-government shall do or fail to do the things set forth in Section 1302. Very generally, the items listed in Section 1302 are similar to the various rights set forth in the United States Constitution or the Bill of Rights. *See discussion infra.*

Section 1303 provides that "[t]he privilege of the writ of habeas corpus shall be available to any person, in a court of the United States, to test the legality of the detention by order of an Indian tribe."

In *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978), a female member of the tribe and her daughter brought an action against the tribe in the district court claiming that an ordinance of the tribe denying tribal membership to the children of female tribe members who married outside the tribe, while extending membership to the children of male members who married outside the tribe, violated Section 1302(8), which provides that an Indian tribe, in exercising its powers of self-government, cannot deny to any person within its jurisdiction the equal protection of its laws. The Supreme Court held that suits against the Tribe under the ICRA are barred by the tribe's sovereign immunity from suit because the ICRA does not subject tribes to the jurisdiction of federal courts in civil actions for declaratory or injunctive relief and the provision of habeas relief in Sec-

tion 1303 did not constitute a general waiver of sovereign immunity.

Therefore, in order for petitioners to proceed in this action, they each must establish that they are entitled to a writ of habeas corpus pursuant to Section 1303.

1. *Requirements for Petition for Writ of Habeas Corpus.*

█ In order to be entitled to a writ of habeas corpus, petitioners must establish that the decision which they are requesting this court to review is criminal and not civil in nature; that petitioners are being detained by the Tribe; and that petitioners have exhausted all other available remedies.

### a. *Criminal or Civil Proceedings.*

As noted, a threshold issue is whether the proceedings at issue by which petitioners were disenrolled from the tribe and banished from the reservation were civil or criminal proceedings.

Respondents argue that the "issue of whether a suitability determination for tribal membership constitutes a civil or criminal proceeding has never been addressed in the Ninth Circuit or any other court for that matter." Contending that exclusionary orders are civil in nature, respondents refer the court to *Hardin v. White Mountain Apache,* 779 F.2d 476 (9th Cir.1985).

In *Hardin,* a nonmember of a tribe brought an action challenging his permanent exclusion from tribal lands following his conviction in federal court for concealment of stolen federal property. The Ninth Circuit held in pertinent part:

The Supreme Court has held that Indian tribes do not have inherent sovereign powers to try and punish non-Indians for criminal acts ... On the other hand, the Supreme Court has also acknowledged that Indian tribes retain inherent sovereign power to exercise '*some* forms of *civil* jurisdiction over non-Indians on

their reservations.' ... Hardin's exclusion falls within the Tribe's civil powers. '[T]he regulation is designed to keep reservation peace and protect the health and safety of tribal members,' ..., and as such is a permissible and 'necessary exercise of tribal self-government and territorial management.' ... Although Hardin attempts to characterize his exclusion as punitive in nature, retribution cannot be the goal of an ordinance that is triggered by a nonmember's crimes against an entirely separate, external state or federal sovereign. The United States has already imposed its own punishment for the nonmember's crime. The intent of the tribal ordinance is merely to remove a person who 'threatens or has some direct effect on the ... health or welfare of the tribe,' ..., a permissible civil regulation of the Tribe's internal order.

779 F.2d at 478–479.

Petitioners argue that *Hardin* is not relevant to the resolution of the issue before the court because *Hardin* involved a non-member of the tribe while petitioners were members at the time of the incident complained of. Respondents contend that this distinction is one "without a difference":

It is a fundamental precept of law that the nature of a proceeding (*i.e.* whether it is considered criminal or civil in nature) is not altered due solely to the status of a party. Consequently, *Hardin* mandates that the exclusion of a tribal member from a tribe's reservation lands is an exercise of a tribe's civil authority and must be considered a civil proceeding. Therefore, this Court must focus on the action of exclusion, which the *Hardin* Court found to be civil, and disregard Petitioners' prior membership status as irrelevant.

Respondents further contend that, when Resolution 00–27 was adopted, petitioners were no longer considered members of the Tribe and, therefore, the Tribe was excluding non-members from its reservation lands in accordance with *Hardin.*

The court cannot conclude from *Hardin* that any exclusion of a previously enrolled tribal member from a reservation is a civil action. The facts in *Hardin* are simply too different to allow that result.

There is no question that the most authoritative discussion of this issue is that in *Poodry v. Tonawanda Band of Seneca Indians,* 85 F.3d 874 (2nd Cir.), *cert. denied,* 519 U.S. 1041, 117 S.Ct. 610, 136 L.Ed.2d 535 (1996).

In *Poodry,* members of the tribe brought petitions for writ of habeas corpus pursuant to Section 1303 challenging the legality of orders issued by members of the tribal council purporting to banish the members from the tribe and reservation after "summarily convicting them of treason." In *Poodry,* the petitioners were "convicted of treason,", sentenced to "permanent banishment," and "stripped of ... Indian citizenship"; their namers were "removed from the Tribal rolls"; and they "permanently [lost] any and all rights afforded [tribal] members." *Id.* at 876, 878. However, they had not yet been physically removed from the reservation. The Second Circuit held in pertinent part:

Because we conclude the tribal action in this case arose in a criminal context, we ultimately need not resolve the question of whether habeas review is restricted to cases involving a tribal criminal conviction.

The respondents' argument that the banishment orders issued against the petitioners reflected a 'civil' determination relies principally on the Supreme Court's recognition in *Santa Clara Pueblo* that a tribe's right to define its membership is central to its autonomy ... The respondents claim that *Santa Clara Pueblo* makes clear that (1) a federally recognized Indian nation possesses 'complete and absolute authority to determine *all* questions of its own membership.' ...; and (2) membership determinations 'are considered civil in nature, regardless of the tribal values informing such determination.' ... *Santa Clara Pueblo* in fact supports neither statement. The first—that authority to determine membership questions is 'complete and absolute'—simply goes too far. While Congress has deferred with regularity to tribal membership determinations ..., there is little question that the power to define membership is subject to limitation by Congress ... Whether § 1302 of the ICRA does in fact impose any limits on tribal authority to determine questions of membership in the tribe is a question on the merits, and one not resolved in *Santa Clara Pueblo.* The second point—that all membership determinations are 'civil in nature'—is nowhere suggested or implied in *Santa Clara Pueblo.* While the Supreme Court observed in the course of its jurisdictional inquiry that a tribe's power to define its membership is an important element of its political and cultural autonomy ..., that observation does not compel the characterization of all actions of tribal governments affecting tribal membership as 'civil in nature.' We decline the respondents' invitation to equate the membership ordinance of the Santa Clara Pueblo, which had general, prospective application, with action taken by members of the Tonawanda Band Council of Chiefs against a handful of individuals found to have engaged in certain prohibited conduct—namely, 'treason.' The Supreme Court in *Santa Clara Pueblo* fully recognized Congress's conclusion that 'the most serious abuses of tribal power had occurred in

the administration of criminal justice,' ...; the case before it simply did not involve the administration of criminal justice. The Court's observation that it would be unwise to *infer* a cause of action that would intrude upon a tribe's right to adopt and enforce a membership ordinance does not bear upon whether an *explicitly created* habeas remedy applies where an individual—who concededly satisfies the general criteria for membership—is stripped of that membership in direct response to allegedly prohibited conduct.

In sum, *Santa Clara Pueblo* simply does not compel the conclusion that all membership determinations are 'civil in nature' and therefore insulated from federal habeas review. While ordinarily the inquiry into whether a sanction is 'criminal' or 'civil' is neither simple nor mechanical, we have no doubt about the resolution here. The documents that the members of the Council of Chiefs served upon the petitioners and circulated to various government agencies indicate that the respondents themselves view the petitioners' conduct as 'criminal': the petitioners are claimed to have engaged in 'unlawful activities,' including 'actions to overthrow, or otherwise bring about the removal of, the traditional government' of the Tonawanda Band. For these actions, the petitioners were 'convicted of TREASON.' Moreover, 'banishment' has clearly and historically been punitive in nature. Examining a statute imposing forfeiture of citizenship upon a natural-born citizen who evaded military service, the Supreme Court found reference to history 'peculiarly appropriate':

> [F]orfeiture of citizenship and the related devices of banishment and exile have throughout history been used as punishment ... Banishment was a weapon in the English legal arsenal for centuries, but it was always ad-

judged a harsh punishment even by men who were accustomed to brutality in the administration of criminal justice.

...

The respondents urged at oral argument that 'treason,' though a criminal act in our judicial system, is not necessarily 'criminal' in a traditional nation such as the Tonawanda Band. We doubt that this appeal to cultural relativism is relevant to our inquiry. The respondents supply no basis for concluding that Congress intended courts to adopt a relativistic view of what constitutes a 'crime' when it enacted § 1303: such a reading would permit a tribal government to evade the federal court review specifically provided in the Indian Civil Rights Act simply by characterizing every tribal government action as 'civil' or nonpunitive ... Although we are required to construe ambiguity in statutes on Indian affairs in favor of preserving Indian sovereignty ..., neither this principle nor *Santa Clara Pueblo*'s tentative and inconclusive assessment of congressional sensitivity to tribal tradition ... calls for wholesale deference to arguments of cultural difference in assessing the scope of a habeas remedy *explicitly* created by a federal statute. The respondents would have us accept on faith their characterization of the alleged acts as non-criminal and the alleged sanction as nonpunitive in the tradition and culture of the Tonawanda Band. In light of multiple sworn statements in the record—including those of a tribal Chief and of clan mothers of the Tonawanda clans—claiming that there is nothing traditional or culture-bound about the treatment of the petitioners at the hands of the respondents, we decline to do so.

85 F.3d at 888–889.

In *Alire v. Jackson*, 65 F.Supp.2d 1124 (D.Or.1999), a member of the Shoshone–

Paiute Indian tribe worked and received health care benefits on the Warm Springs Indian Reservation. She was neither a resident nor a member of the Confederated Tribes of the Warm Springs Reservation of Oregon (the Tribe). Alire pleaded no contest in Tribal Court of one count of child neglect and was sentenced to 180 days in jail on August 21, 1998. On February 10, 1999, 31 tribal members submitted a petition requesting Alire's permanent exclusion and, at a meeting on March 2, 1999, a majority of the Tribal Council voted to exclude her, finding that she had breached the peace, caused physical loss to tribal property, committed a crime, and violated a tribal ordinance. Alire filed a petition for writ of habeas corpus pursuant to Section 1303 alleging various violations of Section 1302. In addressing whether the exclusion was a criminal or civil action, the district court stated in pertinent part:

> Plaintiff relies heavily on *Poodry*, asserting that her 'exclusion' from the Reservation in this case is analogous to the permanent banishment in *Poodry* and this is a criminal proceeding, giving this court jurisdiction. Defendant, on the other hand, relies on *[Santa Clara Pueblo]* ..., asserting that plaintiff's exclusion is more analogous to the membership decision at issue in *[Santa Clara Pueblo]* than to the banishment at issue in *Poodry*. Both parties also argue that this court should recognize 'exclusion' proceedings as always civil or always criminal in nature. I decline to do so. The permanent banishment imposed on the plaintiffs in *Poodry* had a close nexus in time and scope to their alleged criminal activities. Consequently, the Second Circuit had no difficulty arriving at the reasonable conclusion that the banishment was a criminal sanction. Exclusions that lack a similar close nexus, however, are not necessarily construed as criminal proceedings. In *Hardin v. White* ..., for example, the Ninth

Circuit held that the exclusion of a nonmember from tribal lands was an exercise of a tribe's civil jurisdiction.

> Plaintiff in this case asserts that her exclusion was punishment for her earlier criminal conviction. The evidence, however, does not support her claim. In her affidavit, plaintiff states that in connection with her plea bargain, the judge gave her only 'a warning of exclusion.' ... The actual exclusion order was made seven months after plaintiff's criminal conviction, thus lacking the temporal nexus found in *Poodry*. Moreover, in addition to plaintiff's criminal conviction, the exclusion order lists three other, separate offenses under WSTC 300.310 as reasons for her exclusion, further underscoring the absence of a close nexus between plaintiff's criminal conviction and her eventual exclusion from the Reservation.

> Because the evidence fails to establish a close nexus between plaintiff's exclusion and her criminal conviction, I conclude that this particular exclusion order was a valid exercise of the Tribe's civil, not criminal, jurisdiction. Therefore, I also conclude that this court lacks subject matter jurisdiction over plaintiff's petition for habeas relief.

65 F.Supp.2d at 1127–1128.

■ Respondents argue that, compared to *Alire*, this case presents a much more clear case of the exercise of tribal civil jurisdiction. In so arguing, respondents note that there is no underlying criminal conviction of either petitioner and contend:

> There is only a prior civil proceeding wherein the General Council determined that Petitioners were not suitable for tribal membership. Moreover, the membership determination occurred more than five (5) months prior to the civil exclusion order. Additionally, Peti-

tioner Quair did not voluntarily leave the Tribe's Rancheria until one (1) year after being determined unsuitable for tribal membership. This passage of time, along with the fact that suitability determinations for tribal membership are considered civil and not criminal proceedings under the tribal law of the Santa Rosa Rancheria proves that Petitioners cannot satisfy the 'temporal nexus' test discussed in *Alire*.

It is noted that the record does not establish facts similar to *Poodry*, i.e., a charge of "treason". At best, and only with respect to Berna, Berna was removed from her position as treasurer in March, 2000 because of alleged misuse of Tribal funds and later banished from the Tribe at least in part because of this defalcation. However, there are no such facts with respect to Quair. The issue before the court is whether a decision to disenroll tribal members and banish them from the reservation is always a criminal proceeding for purposes of relief pursuant to Section 1303, regardless of the facts underlying the decision. It is noted that *Poodry* does not resolve this issue.

The court concludes that the disenrollment of a tribal member and the banishment of that tribal member constitutes a punitive sanction irregardless of the underlying circumstances leading to those decisions. The Supreme Court has noted that banishment historically has been considered a punitive sanction. Therefore, even if the circumstances leading to imposition of the sanction are not considered criminal conduct *per se*, the imposition of that sanction renders those proceedings criminal for purposes of habeas corpus relief. However, the court concludes that removal from office or employment is not a criminal proceeding within the meaning of habeas corpus for purposes of Section 1303.

b. *Detention.*

As noted, pursuant to Section 1303, habeas corpus is available "to test the legality of the detention by order of an Indian tribe."

Here, there is no question that neither petitioner is or was incarcerated. In *Hensley v. Municipal Court*, 411 U.S. 345, 351, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973), the Supreme Court explained:

The custody requirement of the habeas statute is designed to preserve the writ of habeas corpus as a remedy for severe restraints on individual liberty. Since habeas corpus is an extraordinary remedy whose operation is to a large extent uninhibited by traditional rules of finality and federalism, its use had been limited to cases of special urgency, leaving more conventional remedies for cases in which the restraints on liberty are neither severe nor immediate.

In *Jones v. Cunningham*, 371 U.S. 236, 240, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963), the Supreme Court also stated:

History, usage, and precedent can leave no doubt that, besides physical imprisonment, there are other restraints on a man's liberty, restraints that are not shared by the public generally, which have been thought sufficient in the English-speaking world to support the issuance of habeas corpus.

As summarized in *Williamson v. Gregoire*, 151 F.3d 1180, 1182–1183 (9th Cir.1998), *cert. denied*, 525 U.S. 1081, 119 S.Ct. 824, 142 L.Ed.2d 682 (1999), a case ruling that a state law requiring a sex offender to register was a collateral consequence and not "custody",:

The Supreme Court has repeatedly held that 'habeas corpus is available to an alien seeking entry into the United States, although in those cases each alien was free to go anywhere else in the

world.' ... Similarly, habeas corpus is the proper vehicle to test the legality of once's induction into military service ....

The Court has explained that a parolee is 'in custody' because, '[w]hile petitioner's parole releases him from immediate physical imprisonment, it imposes conditions which significantly confine and restrain his freedom ...' The Court added: 'It is not relevant that conditions and restrictions such as these may be desirable and important parts of the rehabilitative process; what matters is that they significantly restrain petitioner's liberty to do those things which. in this country free men are entitled to do.' ....

Also, a convict released on his own recognizance pending execution of his sentence is 'in custody' because he was obligated to appear at times and places ordered by the court ... 'He cannot come and go as he pleases.' ....

We have held that a sentence of 14 hours of attendance at an alcohol rehabilitation program renders someone 'in custody' ... We reasoned that, '[t]he sentence in this case, requiring appellant's physical presence at a particular place, significantly restrains appellant's liberty to do those things which free persons in the United States are entitled to do and therefore must be characterized for jurisdictional purposes, as 'custody.' ....

Yet, even as the Supreme Court has expanded the reach of the 'in custody' requirement, it has consistently recognized a clear limitation: '[O]nce the sentence imposed for a conviction has completely expired, the collateral consequences of that conviction are not themselves sufficient to render an individual 'in custody' for the purposes of a habeas attack upon it ... Some of the typical collateral consequences of a conviction include the inability to vote, engage in certain businesses, hold public office, or serve as a juror ....

Respondents argue that petitioners' liberty is not being severely restrained because respondents do not exercise control over them:

Petitioners ... are not obligated to physically appear at a particular place at the request of Respondents, are not required to report to a tribal probation officer or participate in a tribal member rehabilitation program due to their exclusion from tribal membership and the tribal community. Petitioners are free to live, work, worship and travel throughout the State of California, the United States and the rest of the world should they so desire. Indeed, Petitioners' freedom of movement is unrestrained. Petitioners are not recognized as members of the Santa Rosa Rancheria Tachi–Yokut Tribe or permitted access on the 390 acres comprising the Tribe's reservation lands. These limitations, however, do not constitute a severe restraint on Petitioners' ... liberty because these restrictions are 'shared by the public generally.' ....

In so arguing, respondents rely on legal authority that tribal membership is a discretionary privilege not shared by the public generally and contend:

While [petitioners] may been the 'literal requirements' for tribal membership, they are still subject to the suitability determination by the General Council. Consequently, since the potential of an adverse suitability determination by the Tribe's General Council is borne by the public generally along with the individuals who may otherwise may satisfy the literal qualifications for tribal membership. Petitioners' adverse membership decision cannot constitute a severe restraint on their liberty.

In addition, respondents argue, petitioners' exclusion from the Tribe's reservation lands is not a severe restraint on their liberty "because tribes act as the exclusive gatekeepers to their tribal lands."

Again, however, respondents refer the court to a case involving the exclusion of a non-member from a reservation. *See Quechan Tribe of Indians v. Rowe*, 531 F.2d 408 (9th Cir.1976).

In *Poodry, supra,* 85 F.3d at 893–898, the Second Circuit concluded that the banishment imposed against the tribal members constituted "detention" within the meaning of Section 1303, stating in pertinent part as follows:

'Restraint' does not require 'on-going supervision' or 'prior approval.' As long as the banishment orders stand, the petitioners may be removed from the Tonawanda Reservation at any time. That they have not been removed thus far does not render them 'free' or 'unrestrained.' While 'supervision' (or harassment) by tribal officials or others acting on their behalf may be sporadic, that only makes it all the more pernicious. Unlike an individual on parole, on probation, or serving a suspended sentence—all 'restraints' found to satisfy the requirement of custody—the petitioners have no ability to predict if, when, or how their sentences will be executed. The petitioners may currently be able to 'come and go' as they please …, but the banishment orders make clear that at some point they may be compelled to 'go,' and no longer welcome to 'come.' That is a severe restraint to which the members of the Tonawanda Band are not generally subject ….

Indeed, we think the existence of the orders of permanent banishment alone—even absent attempts to enforce them—would be sufficient to satisfy the jurisdictional prerequisite for habeas corpus.

We deal here not with a modest fine or a short suspension of a privilege—found not to satisfy the custody requirement for habeas relief—but with the coerced and peremptory deprivation of the petitioners' membership in the tribe and their social and cultural affiliation. To determine the severity of the sanction, we need only look to the orders of banishment themselves, which suggest that banishment is imposed (without notice) only for the most severe crimes: murder, rape, and treason. Had the petitioners been charged with *lesser* offenses and been subjected to the *lesser* punishment of imprisonment, there is no question that a federal court would have the power to inquire into the legality of the tribe's action. The respondents would have us turn the ordinary custody inquiry on its head: the question is not whether a punishment *less* severe than imprisonment—*e.g.,* a fine, probation, or a temporary suspension of privileges—satisfies the custody requirement, but whether a *more* severe punishment does. We believe that Congress could not have intended to permit a tribe to circumvent the ICRA's habeas provision by permanently banishing, rather than imprisoning, members 'convicted' of the offense of treason.

The severity of banishment as a restraint on liberty is well demonstrated by the Supreme Court's treatment of (1) 'denaturalization' proceedings, initiated where an individual has obtained a certificate of U.S. naturalization illegally or through willful misrepresentation; and (2) statutes imposing a penalty of 'denaturalization'—forfeiture of American citizenship—on a natural-born U.S. citizen. Although a denaturalization proceeding is thought to be 'civil' or 'administrative' in nature, the Supreme Court has long recognized that a deprivation of citizenship is 'an extraordinarily severe penal-

ty' with consequences that 'may be more grave than consequences that flow from conviction for crimes.' ... Similarly, the Court has also found the penalty of denationalization of a natural-born citizen, sought to be imposed after conviction for military desertion, to be unconstitutional . . . .

. . .

The fact that permanent banishment has been in the past been imposed as a punitive sanction, in our culture and in others, does not mean that under the laws of the United States it is a sanction not involving a severe restraint on liberty. Where, as here, petitioners seek to test the legality of orders of permanent banishment, a federal district court has subject matter jurisdiction to entertain applications for writs of habeas corpus.

. . .

We pause here to offer a respectful rebuttal to two arguments pursued by our colleagues in dissent. First, the dissent suggests that the proper jurisdictional inquiry under § 1303 requires a court to measure the severity of the restraints on the petitioners in relation to 'the American public at large' rather than in relation to other members of the Tonawanda Band ... This conclusion is based principally on the fact that § 1303 makes the privilege of a writ of habeas corpus available to 'any person' to test the legality of tribal conduct. We believe the reference to 'any person' simply makes clear that § 1303 protects non-Indians and non-member Indians who may come within a tribe's jurisdiction from arbitrary tribal action. It does not follow that § 1303 guards only those liberties shared by all who may invoke its protection. If we recognize, as our dissenting colleague does, that there is something distinct and important about Indian nationhood and culture that the ICRA is designed to promote and sustain, surely § 1303 cannot be thought to guarantee

only that 'liberty' enjoyed *outside* an Indian reservation (by 'the American public at large').

The dissent concedes that 'one who is banished from the United States or excluded from some place within the United States' suffers a severe restraint on liberty, because such an individual cannot go or remain where the rest of the general population has the right to be ... Yet a deprivation of citizenship does more than merely restrict one's freedom to go or remain where others have the right to be: it often works a destruction of one's social, cultural, and political existence. To measure whether summary banishment from a tribe constitutes a severe deprivation solely by reference to the liberties of other Americans is tantamount to suggesting that the petitioners cannot live among members of *their* nation simply because other Americans cannot do so; and that the coerced loss of an individual's social, cultural, and political affiliations is unimportant because other Americans do not share them. Such an approach renders the concept of liberty hollow indeed.

Second, the dissent suggest that permitting a federal court to review a tribe's decision to banish one of its members would constitute undue interference with a tribe's sovereign power to determine tribal membership ... In examining what tribal sovereignty does and does not permit, the dissent merges the jurisdictional analysis that we must undertake in this case with an inquiry on the merits. We respectfully but emphatically disagree with the suggestion that 'the decisive question on this appeal [is] whether the Tonawanda Band had the power to strip petitioners of their tribal membership,' ... the question is, rather, whether a federal court has jurisdiction to examine the scope of and limitations on the Tonawanda Band's power to strip

the petitioners of their tribal membership ... Moreover, the dissent appears to resolve the inquiry on the merits without reference to the will of Congress. While we fully agree that the power to determine questions of tribal membership is one aspect of retained tribal sovereignty ..., that power exists only to the extent that it is not limited by treaty or federal statute ... Although we do not reach the question here, we note that Title I of the ICRA may well be a federal statute that imposes limitations on a tribe's power to summarily banish its members.

*Id*, 85 F.3d at 895–898.

■ The court concludes that disenrollment from tribal membership and subsequent banishment from the reservation constitutes detention in the sense of a severe restriction on petitioners' liberty not shared by other members of the Tribe. The court finds the rationale of *Poodry* quoted above persuasive. The fact that petitioners have already been physically banished from the reservation does not negate this conclusion.

■ However, the court concludes that removal from office or employment is not "detention" within the meaning of habeas corpus for purposes of Section 1303.

#### c. *Exhaustion of Remedies.*

■ The third requirement for habeas corpus review is a showing that petitioner has exhausted all other available remedies.

Petitioners contend that the Tribe had no procedure to appeal banishment in June 2000 because the Articles of Community Organization did not provide for banishment of Tribal members. Furthermore, petitioners contend, they never received any written notice advising them of any appeal tribal appeal process.

Respondents contend that petitioners have not exhausted all other available remedies because petitioners could have submitted membership applications to the Tribe since their exclusion from tribal membership and the tribal community. Respondents assert that petitioners have presented no facts from which it may be inferred that applying for membership would have been futile and that petitioners' assertions that the Tribe has no procedure to appeal a banishment or that this appeal procedure was undefined are "simply irrelevant to the question at hand."

In so arguing, respondents refer the court to *Robb v. Bethel School District*, 308 F.3d 1047 (9th Cir.2002), a case involving the IDEA. In *Robb*, the Ninth Circuit stated in pertinent part:

Our primary concern in determining whether a plaintiff must use the IDEA's administrative procedures relates to the source and nature of the alleged injuries for which he or she seeks a remedy, not the specific remedy requested. *The dispositive question generally is whether the plaintiff has alleged injuries that could be redressed to any degree by the IDEA's administrative procedures and remedies.* If so, exhaustion of those remedies is required. If not, the claim necessarily falls outside the IDEA's scope, and exhaustion is unnecessary. Where the IDEA's ability to remedy a particular injury is unclear, exhaustion should be required to give educational agencies an initial opportunity to ascertain and alleviate the alleged problem.

308 F.3d at 1050 (emphasis added).

Respondents rely on the emphasized statement from *Robb* in contending that "[t]here is no reason why this analogous precedent cannot be applied to Petitioners' situation." Respondents argue:

In this matter, the available tribal remedies, provide Petitioners with the opportunity to once again become tribal members ... A careful analysis of Petitioners' prayers for relief demonstrates

this is the bulk of the relief Petitioners are seeking ... Therefore, as the Tribe provides Petitioners with a tribal remedy capable of redressing their grievances, this Court must decline to exercise jurisdiction until this tribal process is fully completed.

Respondents further contend that petitioners have not presented evidence that this remedy will be futile because of bias on the part of the tribal or administrative forum:

The Tribe has provided a detailed review and approval process in the Enrollment Ordinance. As a procedural safeguard, the Tribe's Enrollment Ordinance provides Petitioners with a variety of appellate options, one of which is direct appeal to the U.S. Secretary of the Interior. While Petitioners are likely to raise charges of bias in regards to the Tribe's Membership Committee and General Council, Petitioners cannot make a colorable claim that the Secretary of the Interior is biased against them or has already reached a determination on this matter. Consequently, as the Tribe clearly has a process in place to handle decisions regarding membership, which provides substantive appeal to a neutral third-party with extensive expertise in this area, this Court must defer to this process.

Respondents' position misunderstands the purpose of the petitions for writ of habeas corpus. Petitioners are asserting that the decisions to disenroll and banish them was made without the benefit of the various protections set forth in Section 1302. Petitioners' position is that the Tribe provides no procedure to appeal *those* decisions and to raise the contentions being raised in their petitions as grounds for relief, i.e., the alleged violations of Section 1302. The fact that petitioners can reapply for membership in the Tribe does not address these issues.

The record establishes that petitioners did attempt to appeal the decision to disenroll them to the General Council and their respective appeals were denied. It is not disputed by respondents that the Tribe has no procedure by which petitioners could have appealed the decision to banish them. Furthermore, it is undisputed that the Tribe had no Tribal Court to which petitioners could have appealed the decision to banish them. As petitioners note, exhaustion of tribal remedies has been excused as futile in the absence of a tribal court. *See Johnson v. Gila River Indian Community*, 174 F.3d 1032, 1036 (9th Cir. 1999).

Therefore, the court concludes that petitioners have established the exhaustion of remedies component of habeas relief with respect to the decisions to disenroll and banish them from the Tribe.

#### d. *Proper Respondent.*

██ Respondents further contend that Mike Sisco, Elmer Thomas, Dena Baga, Kevin Thomas, Elaine Jeff and Patricia Davis are not proper respondents in the petitions for writ of habeas corpus. In so asserting, respondents refer the court to *Brittingham v. United States*, 982 F.2d 378, 379 (9th Cir.1992):

For a court to hear a petition for writ of habeas corpus, it must have jurisdiction over the prisoner or his custodian .... The proper respondent in a federal habeas corpus petition is the petitioner's 'immediate custodian.' ... A custodian 'is the person having a day-to-day control over the prisoner. That person is the only one who can produce "the body" of the petitioner.' ....

Respondents contend that petitioners have failed to allege how they exercise day-to-day control over their actions. Respondents contend that they cannot summon petitioners to appear at their discretion or

produce the petitioners if this Court would so order. Respondents further argue that "[i]t is also incumbent that the respondent in a habeas corpus action be able to grant the relief that the petitioners seek." Respondents claim:

> [They] do not have the capability or authority to release Petitioners from their purported captivity by the Tribe, let alone reinstate Petitioners as members of the Tribe, annul Petitioners' exclusion from the tribal community and reimburse Petitioners' for per capita payments on a retroactive basis. The ability to make these decisions rests entirely with the General Council and not Respondents. The General Council made the original decisions in these matters and under the tribal law of the Santa Rosa Rancheria, only the General Council can reverse these determinations.
>
> ...
>
> The reason why Petitioners are not suing the General Council is that the General Council is the Tribe. Even *Poodry* acknowledges that tribes are not a proper respondent to habeas corpus proceedings because 'petitions for the writ of habeas corpus are properly viewed as proceeding against *tribal officials* allegedly acting in violation of federal law and therefore outside the lawful authority of the tribe; the petitions do not create actions against the tribe at all.' ... Therefore, the proper party to this litigation is ... the Tribe's General Council. Since Petitioners have failed to join the General Council as an indispensable party ... and the fact that the General Council cannot be joined as a party to Petitioners' suit, Petitioners' claims must be dismissed in accordance with *Pit River Home & Agric. Coop. Ass'n v. United States*, 30 F.3d 1088 (9th Cir.1994).

In *Poodry, supra,* 85 F.3d at 899–900, the Second Circuit addressed the issue of the proper respondent in a petition for writ of habeas corpus filed pursuant to Section 1303, concluding in pertinent part:

> The petitions ... name as respondents the tribal officials allegedly responsible for issuing the banishment orders in this case ... We note ... that the individual respondents can be properly thought 'custodians' of the petitioners, despite the fact that the petitioners, though restrained, are not in physical custody. As the 'custody' requirement has expanded to encompass more than actual physical custody, so too has the concept of a custodian as a respondent in a habeas case. In examining who the proper respondent would be in a case involving a petitioner free on bail prior to a possible retrial, the Seventh Circuit has observed that
>
>> [a] person released on his own recognizance is usually considered to be in his own custody; a person released after posting bail is usually considered to be in either his lawyer's custody or the bondman's custody. But it would be odd to make any of these the respondent in a habeas action ....
>>
>> ....
>
> The truth is that no one has custody of a person who is out on bail but that the Supreme Court has decided that such a person should be allowed to seek unconditional freedom through an action for habeas corpus despite the absence of a custodian. The important thing *is not the quest for a mythical custodian, but that the petitioner name as respondent someone (or some institution) who has both an interest in opposing the petition if it lacks merit, and the power to give the petitioner what he seeks (if the peti-*

*tion has merit—namely his unconditional freedom.)*

... The individual respondents surely fit this description—they have an interest in opposing the petitions, as well as the ability to lift the banishment orders, should the petitions be found on remand to have merit.

In *Armentero v. I.N.S.*, 340 F.3d 1058, 1064 (9th Cir.2003), a case involving INS detainees, the Ninth Circuit construed Supreme Court authority as indicating "that the concept of custodian is a broad one that includes any person empowered to end restraint of a habeas petitioner's liberty, not just the petitioner's on-site, immediate physical custodian." The Ninth Circuit further stated:

What we do glean from these cases and others is that, while a petitioner's immediate physical custodian is typically a proper respondent in traditional habeas petitions, the statutory custodian requirement of 28 U.S.C. § 2241 is sufficiently flexible to permit the naming of respondents who are not immediate physical custodians if practicality, efficiency, and the interests of justice so demand.

340 F.3d at 1068.

Relying on *Poodry* and *Armentero* and the cases cited therein discussing the meaning of custodian in the context of Section 1303, petitioners contend that the members of the Tribal Council are the proper respondents because they are empowered to end petitioners' banishment, asserting:

As a matter of practice, the Tribal Council has overturned General Council decisions that it deemed wrongful. In 1999, Clarence Atwell, the Tribal Chairman, wrote to Petitioner Berna while she was tribal chairman. The memo mentioned the General Council's 'lack of authority to disenroll Tribal Members,' and authorized Berna to release checks to the 'wrongly disenrolled' Tribal Members ... In addition, in this case, the General Council has expressly conveyed this power to the Tribal Council. Resolution 00–27 gave the Tribal Council the power to implement and alter its provisions as they saw fit ... Since the Tribal Council is empowered to end the Petitioners' restraint by ceasing to enforce the banishment order or by overruling the General Council's banishment order, they are the correct respondents.

To find otherwise would render ICRA's habeas remedy impotent. It would never be procedurally possible to bring a habeas petition against every voting member of the Tribe, which would require serving hundreds of people across different states ... As a result, such a requirement would allow the General Council to exercise its powers in any way it pleased, unchecked by the remedy provided by ICRA. Moreover, allowing Petitioners to name Respondents provides for prompt and efficient resolution of their claims, which is an important objective of habeas review.

The court agrees with petitioners. Requiring petitioners to name and sue every member of the Tribe's General Council as a respondent in a habeas corpus proceeding pursuant to Section 1303 makes that remedy unavailable for all practical purposes. It is apparent from the record before the court that the Tribal Council acts on behalf of and at the behest of the General Council. Therefore, the members of the Tribal Council are the proper respondents in this matter.

*2. Lack of Subject Matter Jurisdiction Over Membership and Exclusionary Decisions.*

■ Respondents contend that this court lacks subject matter jurisdiction to resolve claims involving membership and exclusionary decisions by the Tribe, assert-

ing that these decisions are internal tribal matters vested exclusively with the Tribe and its institutions.

 As explained in *Santa Clara Pueblo, supra,* 436 U.S. at 55–56, 98 S.Ct. 1670:

Indian tribes are 'distinct, independent political communities, retaining their original natural rights' in matters of local self-government ... Although no longer 'possessed of the full attributes of sovereignty,' they remain a 'separate people, with the power of regulating their internal and social relations.' ... They have the power to make their own substantive law in internal matters ... and to enforce that law in their own forums.....

"Indian tribes retain their inherent power to determine tribal membership ...." *Montana v. United States,* 450 U.S. 544, 564, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), citing *United States v. Wheeler,* 435 U.S. 313, 322 n. 18, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978).

Respondents argue that petitioners "request this Court to intrude upon this delicate matter and curtail the Tribe's sovereign prerogative to determine an individual's suitability for tribal membership." Respondents further contend that, "[w]hile artfully plead, Petitioners' utilization of the writ of habeas corpus cannot confer upon this Court jurisdiction, which it lacks in the first instance."

Respondents refer the court to *Smith v. Babbitt,* 100 F.3d 556 (8th Cir.1996), *cert. denied,* 522 U.S. 807, 118 S.Ct. 46, 139 L.Ed.2d 12 (1997). In *Smith,* members and nonmembers of a tribe sued the tribe, its business council, tribal and federal officials challenging the allocation of per capita distributions of gaming proceeds as violative of the Indian Gaming Regulatory Act (IGRA), ICRA, the Indian Reorganization Act (IRA), RICO, and the tribal constitution. The Eighth Circuit held that the federal court lacked subject matter jurisdiction:

Careful examination of the complaints and the record reveals that this action is an attempt by plaintiffs to appeal the Tribe's membership determinations. It is true that appellants allege violations of IGRA, ICRA, IRA, and RICO, and the Tribe's Constitution. However, upon closer examination, we find that these allegations are merely attempts to move this dispute, over which this court would not otherwise have jurisdiction, into federal court.....

...

We agree with the district court that this is essentially an intra-tribal dispute. As such, this court does not have jurisdiction to consider this appeal. Consequently, we find that this case is most properly left to tribal authorities, in whom the discretion over tribal membership determinations is vested.

100 F.3d at 559.

Petitioners respond that these principles do not apply to a decision to banish tribal members:

Respondents seem to be intimating that *Babbitt* holds that all Tribal governmental decisions are insulated from review. That is patently false. There is no dispute that some tribal resolutions are reviewable ... The question here is whether this resolution, which involves banishment, fits into the category of reviewable tribal decisions.

Because the court has concluded that petitioners are entitled to bring these petitions pursuant to Section 1303, the fact that the penalties imposed, disenrollment and banishment, involve the tribe's membership determination, is not subject to the principles cited by respondents. Furthermore, the court is not addressing whether the decisions to disenroll and banish petitioners should or should not have been

made in their particular cases. Rather, the court is addressing whether the General Council and the Tribe were required to comply with the requirements of Section 1302 in making these decisions. Therefore, the contention that this court lacks subject matter jurisdiction because the petitions ultimately involve decisions about internal tribal matters is not well-taken.

 Respondents further contend that decisions involving tribal membership and exclusion from tribal lands are political questions which federal courts are inappropriate forums to resolve:

> [M]embership determinations and decisions to exclude individuals from a tribe's reservation lands raise issues of jurisprudential deference closely akin to the well established political question doctrine. In matters involving political questions, the court is not necessarily deprived of subject matter jurisdiction over the action but recognizes its inherent limitation in granting the relief requested. Therefore, as a matter of deference to other governmental institution [sic] more suited to resolve the controversy, courts will abstain from becoming involved.

In so arguing, respondents refer the court to *Patterson v. Council of the Seneca Nation*, 245 N.Y. 433, 446, 157 N.E. 734 (1927), wherein the court ruled that "[t]he question whether or not the Respondent is a Seneca Indian, entitled to enrollment as such, is primarily not a judicial but a political question [that] must be determined by the self-governing Seneca Nation, through its council, according to Seneca law, usages and customs ...." In addition, respondents cite *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962):

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion[.]

Respondents argue that questions regarding membership and exclusion from the reservation are necessarily political determinations from which this court should abstain. Respondents note that Article IV, §§ 1(D) and (J) of the Articles of Community Organization vest the General Council with the power to "establish rules or procedures for the conduct of its affairs" and "to control future membership, loss of membership, and the adoption of members", contending that these provisions constitute a "textually demonstrable constitutional commitment of these issues" to the General Council and not to the federal courts. Secondly, respondents assert that issues involving an individual's eligibility for membership and exclusion from the reservation lack judicially discoverable and manageable standards and which may result in the court being required to interpret tribal law. Respondents note that membership decisions "depend on questions of tribal tradition and custom which tribal forums may be in a better position to evaluate than federal courts", *Santa Clara Pueblo, supra*, 436 U.S. at 71, 98 S.Ct. 1670, and that "disputes involving questions of interpretation of the tribal constitution and tribal law [are] not within the jurisdiction of the [federal courts]." *Runs After v. United States*, 766 F.2d 347, 352 (8th Cir.1985). Respondents further argue that, even if the court decides to grant petitioners' applications for writ of habeas corpus, it is unclear what relief can be granted by this court. Respondents contend that the court "must acknowledge that the Tribe is the only institution where Petitioners can obtain the relief they seek and abstain from participating in this delicate member-

ship matter." Finally, respondents contend that a decision by this court to reinstate petitioners as members of the Tribe and reverse their exclusion from the reservation "requires a policy determination, which is clearly non-judicial in nature":

> To grant Petitioners' requested relief, this Court must reverse the General Council's determination that Petitioners are unsuitable for tribal membership and a threat to the tribal community. Such a decision by the Court is non-judicial in nature because the Court will necessarily have to make a finding that the Petitioners are suitable for tribal membership and do not constitute a threat to the tribal community. These determinations cannot be made via readily applicable judicial standards, but require the Court to decide what qualities make an individual suitable for membership in the ... Tribe and what activities warrant an individual's exclusion from the tribal community.

Petitioners describe respondents' invocation of the political question doctrine as "insupportable". Petitioners contend that "[i]n order to guarantee Indians certain basic liberties including due process, equal protection, free speech and safeguards against unjust criminal proceedings, federal courts routinely hear cases alleging violations of the Indian Civil Rights Act."

Petitioners' position is not quite accurate. As noted, the Supreme Court has limited federal jurisdiction under the ICRA in *Santa Clara Pueblo*. Only because petitioners have established that they are entitled to seek habeas corpus pursuant to Section 1303 are petitioners able to proceed with their claims in federal court under the ICRA. Nonetheless, respondents' invocation of the political question doctrine as a challenge to this court's jurisdiction is too broad. As discussed *infra*, the rights guaranteed under Section 1302 are procedural in nature and do not require a specific substantive remedy. For instance, if the court concludes that petitioners were denied their rights to procedural due process in connection with the decisions to disenroll them and banish them from the reservation, the remedy is not reinstatement, which would interfere with tribal sovereign immunity and internal tribal affairs but, rather, a direction to provide appropriate due process, essentially a re-hearing. This balancing of rights and limited remedies should have the effect of vindicating and protecting the rights of both parties. Consequently, while respondents' arguments concerning the political question doctrine are of consequence, they do not require this court to abstain from the exercise of its jurisdiction.

### 3. *Merits of Petitioners' Claims.*

Because the court concludes that petitioners can proceed pursuant to Section 1303, the court addresses whether the parties are entitled to summary judgment with respect to the various claims made by petitioners that respondents violated Section 1302.

### a. *Denial of Due Process.*

Section 1302(8) provides that no tribe in exercising powers of self-government shall "deprive any person of liberty or property without due process of law."

Petitioners contend that they were deprived of their "royalties and benefits", i.e., their monthly per capita payments, living expense payments, educational payments, regular bonuses, and in Quair's case, the rental of a residence on the Rancheria, without due process of law.

Respondents argue that petitioners' received all appropriate due process under tribal customs.

The court denies the respective motions for summary judgment with regard to these claims. As discussed above, it is

disputed whether petitioners received any prior notice that their disenrollment from the tribe was going to be heard and decided at the June 1, 2000 General Council meeting and whether petitioners received any notice that a resolution for their banishment from the reservation was going to be discussed at the October General Council meeting. Furthermore, the facts are disputed with regard to the extent to which petitioners were able to present their positions to the General Council prior to the respective votes. Until these underlying factual disputes are resolved, the court cannot conclude whether either of the petitioners are entitled to relief with regard to these claims.

b. *Denial of a Fair Trial.*

■ Section 1302(6) provides that no tribe in exercising powers of self-government shall "deny to any person in a criminal proceeding the right to a speedy and public trial, to be informed of the nature and cause of the accusation, to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and at his own expense to have the assistance of counsel for his defense."

Petitioners contend that they were denied all of these rights at the June 1, 2000 General Council meeting.

However, it is disputed whether petitioners were informed "of the nature and cause of the accusation", thereby raising a question of fact whether petitioners were denied the right "to a speedy and public trial" and "to be confronted with the witnesses" against them. While it is undisputed that petitioners did not cross-examine anyone at the June 1, 2000 General Council meeting, assuming petitioners had notice prior to the June 1, 2000 General Council meeting that a motion and vote to disenroll them was going to be heard, petitioners could have had tribal members speak on their behalf and could have questioned those tribal members arguing for their disenrollment. However, because the record is clear that the June 1, 2000 General Council meeting was so contentious that members may have been prevented from speaking by being shouted down, there is a question of fact whether this right was available to petitioners. Petitioners present no evidence that they were prevented from bringing an attorney to represent them at the June 1, 2000 hearing. Again, however, because it is disputed whether petitioners had notice that their disenrollment from the Tribe was going to be voted on at that meeting and because permission of the General Council is required before non-members can attend a General Council meeting, there is a question of fact whether petitioners knew in advance that they had such a right.

Consequently, the court denies both motions for summary judgment with respect to this claim for relief.

c. *Exceeded Jurisdiction in Imposing Banishment and Loss of Benefits in Violation of Section 1302(7).*

■ Section 1302(7) provides that no tribe in exercising powers of self-government shall "require excessive bail, impose excessive fines, inflict cruel and unusual punishments, and in no event impose for the conviction of any one offense any penalty or punishment greater than imprisonment for a term of one year and a fine of $5,000, or both."

Relying on *Poodry* in contending that banishment is a restraint on one's liberty for purposes of habeas corpus under Section 1303, petitioners contend that their banishment has lasted longer than one year and that the loss of their benefits and royalties, asserted to amount to a $3,500 monthly loss, exceed the $5,000 limit set forth in Section 1302(7).

■ Petitioners have not been imprisoned. The court does not equate the monetary value of the loss of benefits as a "fine" within the meaning of Section 1302(7).[4]

Consequently, the court concludes that respondents have not violated Section 1302(7) and that petitioners' motion for summary judgment is denied and respondents' motion granted with regard to this claim.

d. *Exceeded Jurisdiction at March 31, 2000 General Council Meeting.*

Petitioner Berna asserts that the charge of financial wrongdoing made against her at the March 31, 2000 General Council meeting was made in excess of the authority of the General Council and, thus, the General Council acted in excess of its authority because such a charge is within the sole purview of the federal courts.

However, as the court has concluded *supra*, the decision at the March 31, 2000 General Council meeting was not a criminal proceeding within the meaning of Section 1303. Therefore, this issue is not properly before the court.

Consequently, the court denies petitioners' motion and grants respondents' motion with regard to this claim.

e. *Double Jeopardy.*

■ Section 1302(3) provides no tribe in exercising powers of self-government shall "subject any person for the same offense to be twice put in jeopardy."

■ As explained in *Department of Revenue of Montana v. Kurth Ranch*, 511 U.S. 767, 769 n. 1, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994):

The Fifth Amendment provides that 'No person shall ... be subject for the same offense to be twice put in jeopardy of life or limb ....' The Double Jeopardy Clause protects against a second prosecution for the same offense after acquittal, a second prosecution for the same offense after conviction, and multiple punishments for the same offense.

Petitioner Berna contends that Section 1302(3) was violated because she

was twice *charged* for misuse of Tribal assets on March 31, 2000 and on June 1, 2000 this charge was again brought up as an excuse for the disenrollment and banishment of Petitioner Berna. She was also *punished* twice for the same offense, recall and firing on March 31, 2000, and disenrollment and banishment on June 1, 2000.

However, for the reasons discussed *supra*, the decisions to remove Berna from office and terminate her employment with the Tribe are not criminal proceedings within the meaning of Section 1303.

Consequently, the court denies petitioners' motion and grants respondents' motion with regard to this claim.

f. *Excess of Jurisdiction—Act in Violation of Tribal Constitution.*

■ Petitioners concede that, as a general rule, federal courts will not review an alleged violation of a tribal constitution on the ground that it is an internal tribal matter subject to sovereign immunity. Nonetheless, petitioners assert, "when the violation of its own Tribal Constitution allows a tribe to exceed its jurisdiction under the Indian Civil Rights Act, the Court does have jurisdiction to review the matter."

■ However, the case cited by petitioners, *Wendt v. Smith*, 2003 WL 21750676 (C.D.Cal.2003) does not so hold, specifically declining to address the issue. From the court's research, petitioners' claim is barred by the doctrine of sover-

---

**4.** Furthermore, tribal members have no vested right to tribal funds until they have received payment. Felix S. Cohen, Handbook of Federal Indian Law 606 (1982 ed.).

eign immunity. "Jurisdiction to resolve internal tribal disputes, interpret tribal constitutions and laws, and issue tribal membership determinations lies with Indian tribes and not in the district courts." *In re Sac & Fox Tribe of Mississippi Iowa/Meskwaki,* 340 F.3d 749, 763 (8th Cir.2003). Because respondents have been sued in their official capacities, these claims are barred by the doctrine of sovereign immunity.

Consequently, the court denies petitioners' motion and grants respondents' motion with regard to this claim.

g. *Excess of Jurisdiction—Failure to Obtain BIA Approval.*

■ Petitioners claim that respondents acted in an excess of jurisdiction in enacting and implementing Resolution 00–27. In so asserting, petitioners contend that the Articles of Community Organization require that all ordinances and resolutions adopted by the General Council be approved by the Bureau of Indian Affairs.

Article VI of the Articles of Community Organization provides in pertinent part:

The following powers shall be set forth or resolutions passed by the General Council and approved by the Commissioner of Indian Affairs.

E. To make assignments of rancheria lands and to lease rancheria lands.

F. To administer community assets and to manage all economic affairs and enterprises of the community.

G. To acquire property and gifts.

H. To borrow money and pledge the assets of the Community;

I. To assess fees for payment of expenses of the Community.

J. To control future membership, loss of membership and the adoption of members.

K. To delegate any of its authorities or responsibilities to the Business Committee or any other committees which it might establish.

Petitioners note that there is no signature on Ordinance 00–27 and contend that the ordinance is invalid on its face.

Respondents contend that the Articles of Community Organization "are quite clear regarding the specific types of ordinances and resolutions that might be sent to BIA for approval" and that "Resolution 00–27 does not fall within this list . . . ."

However, from the court's reading of the Articles of Community Organization, BIA approval of Resolution 00–27 is required because it is a resolution "[t]o control future membership, loss of membership and the adoption of members". Respondents refer to the court to William C. Canby, Jr., American Indian Law in a Nutshell 52 (3rd Ed.1998) for the proposition that "the current federal policy of emphasizing tribal self-determination has sharply curtailed the BIA's role in tribal affairs" and that "[t]herefore, it is irrelevant, whether the BIA has or has not approved Resolution 00–27 as this issue is exclusively a matter for the Tribe." However, this general statement does not overcome the specific requirement of the Articles of Community Organization.

Therefore, the court concludes that petitioners are entitled to summary judgment on this ground.

h. *Assets Held in Trust Cannot Be Abrogated by General Council.*

■ Petitioners assert that "[w]here Tribal property and rights associated with it is held in common by all members of a tribe, an individual tribal member has a vested ownership interest in these property rights as well" and that they "have individual trust rights under ICRA and receive protection under the Indian Reorganization Act (IRA)" and that, therefore, "[t]he Tribe cannot summarily abrogate all

of the rights of Petitioners without federal concurrence." Consequently, petitioners argue "the General Council had no legal authority to take away Petitioners' assets (their royalties and benefits)."

However, the only two cases cited by petitioners do not support this assertion.

In *Santa Rosa Band of Indians v. Kings County*, 532 F.2d 655 (9th Cir.1975), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 731, 50 L.Ed.2d 748 (1977), the Tribe brought an action to restrain enforce of certain county ordinances. The Ninth Circuit held that Kings County was without jurisdiction to enforce zoning ordinances or building codes on Indian reservation trust lands. In so holding, the Ninth Circuit ruled that "[t]he Santa Rosa Band is an Indian Tribe, organized under § 476 of the Indian Reorganization Act of 1934, 25 U.S.C. §§ 461–478 (1970); legal title to the Rancheria's lands is held in trust by the United States for the use and benefit of the Band." 532 F.2d at 657.

In *Kimball v. Callahan*, 590 F.2d 768 (9th Cir.), *cert. denied*, 444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33 (1979), the Ninth Circuit ruled that certain members of the Klamath Tribe were entitled to hunt, trap and fish within their ancestral reservation as it existed at the termination of the Klamath treaty, free from regulation by the State of Oregon. The Ninth Circuit stated in pertinent part:

> From *Mason* it is clear that an individual Indian enjoys a right of user in tribal property derived from the legal or equitable property right of the Tribe of which he is a member ... Prior to the Termination Act, the Klamath Tribe held treaty hunting, fishing and trapping rights within its reservation in which the individual members of the Tribe held rights of user. The Termination Act did not affect these rights. That an individual member withdrew from the Tribe for purposes of the Termination Act did not

change his relationship with the Tribe as to matters unaffected by the Act, e.g., treaty hunting, fishing, and trapping rights ....

590 F.2d at 773.

Neither of these cases support the position that the General Council had no authority to eliminate petitioners' rights to health benefits and services and other payments previously received from the Tribe. That the land on which the Rancheria is located is held in trust by the United States does not support a conclusion that all financial benefits derived from the Tribe's business operations on that land are also held in trust in perpetuity for persons who were at one time members of the Tribe. Furthermore, the proceeds of Indian gaming are not held in trust by the United States. *See Vizenor v. Babbitt*, 927 F.Supp. 1193, 1201–1203 (D.Minn.1996).

ACCORDINGLY, IT IS ORDERED that petitioners' motion for summary judgment is granted in part and denied in part.

IT IS FURTHER ORDERED that respondents' motion for summary judgment is granted in part and denied in part.