EDMUND G. BROWN JR. Attorney General DANIEL G. STONE Deputy Attorney General.
THE CALIFORNIA DEPARTMENT OF TRANSPORTATION has requested an opinion on the following questions:
1. Does article I, section 31, of the California Constitution bar the Department of Transportation from including hiring preferences established by Tribal Employment Rights Ordinances and permitted by federal law, as part of its contracts for highway construction and maintenance work performed on Indian tribal lands?
2. If the Department of Transportation is not constitutionally prohibited from including such hiring preferences as part of its contracts, does it have existing statutory authority to do so?
3. Is the Department of Transportation subject to, and authorized to pay, tribal taxes established by Tribal Employment Rights Ordinances for highway work performed within Department rights of way on tribal lands? *Page 2 
4. Where such highway work within Department rights of way is conducted by private contractors and subcontractors of the Department of Transportation, rather than by Department employees, are such contractors and subcontractors subject to taxes established by Tribal Employment Rights Ordinances?
 CONCLUSIONS
1. Article I, section 31, of the California Constitution does not prohibit the Department of Transportation from including Indian hiring preferences established by Tribal Employment Rights Ordinances and permitted by federal law, as part of its contracts for highway construction and maintenance work performed on Indian tribal lands, as a matter of government-to-government agreement.
2. Under its existing statutory authority, the Department of Transportation may include such hiring preferences as part of its contracts for highway construction and maintenance work performed on or near tribal lands.
3. The Department of Transportation is not required to pay taxes established by Tribal Employment Rights Ordinances for highway work performed on roads located within Department rights of way on tribal lands, but neither is the Department prohibited by law from voluntarily paying Tribal Employment Rights Ordinances fees or taxes if the Department, in its reasonable exercise of discretion, concludes that such payments further its authorized purposes.
4. Where such highway work within Department rights of way on tribal land is performed by private contractors and subcontractors of the Department of Transportation rather than by Department employees, the tribes lack jurisdiction to require the state's contractors and subcontractors to pay taxes established by Tribal Employment Rights Ordinances.
 ANALYSIS
The questions posed here concern road construction and maintenance work performed by the state Department of Transportation (Department), [1]
either directly or through private contractors, on roads located on Indian land and subject to Indian tribal *Page 3 
jurisdiction in California, [2] and on projects subject to the non-discrimination provisions of the Federal-Aid Highway Act.[3] We are informed that virtually all of these roads are within legal rights of way held by the state; for our purposes, we will assume that to be the case for every road in question.[4] We are asked to determine whether and to what extent, in such circumstances, the Department and its private contractors may be subject to either of two tribe-established conditions that may normally attach to such projects (i.e., projects undertaken by non-tribal entities on tribal land) as a result of Tribal Employment Rights Ordinances, or "TEROs," which impose employment preferences for Native Americans[5] (e.g., in hiring, training, promotion, retention) and special project fees or taxes.
Typically, a TERO requires non-tribal employers performing work on tribal lands to (1) honor preferential employment and training standards to ensure that Native American workers have opportunities to take part in the projects' workforces; and (2) pay the tribe a project tax or fee ("TERO tax"), often calculated as a percentage of the total *Page 4 
dollar amount of the payroll or of the contract for the work performed. TERO tax revenues are typically used to fund employment development programs conducted by the tribe's TERO office, such as skills assessment and training, job referrals and placements, and promotion of employment opportunities.[6] We are informed that TEROs may feature a variety of other provisions as well (relating, for example, to job qualifications, apprenticeship programs, counseling, dismissals, inspections, and non-compliance), [7] but this opinion is limited to TERO employment preferences and TERO taxes.[8]
Proposition 209: California's Non-Discrimination Policy
This state's principal rule against discrimination in public employment and public contracts is set forth in section 31 of article 1 of the California Constitution, adopted by the voters as Proposition 209 in the November 1996 general election.[9] Section 31 provides, in pertinent part:
 (a) The state shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting. *Page 5 
 (e) Nothing in this section shall be interpreted as prohibiting action which must be taken to establish or maintain eligibility for any federal program, where ineligibility would result in a loss of federal funds to the state.
 (f) For the purposes of this section, "state" shall include, but not necessarily be limited to, the state itself, any city, county, city and county, public university system, including the University of California, community college district, school district, special district, or any other political subdivision or governmental instrumentality of or within the state.
 . . . . .[10]
This provision "does not purport to apply to every distinction made on the basis of race, sex, color, ethnicity, or national origin, but only to discrimination or preferences in the operation of public employment, public education, or public contracting."[11]
In the circumstances presented here, we believe that the term "public employment" includes highway work performed by Department employees, and that the term "public contracting" embraces contractual arrangements like those contemplated here, through which the Department contracts with private providers of goods or services to perform construction and maintenance work on public roads. Hence, in this context, section 31 forbids the Department to discriminate against current or prospective employees or contractors, or grant them preferential treatment, "on the basis of race, sex, color, ethnicity, or national origin."[12] *Page 6 
In Hi-Voltage, [13] the California Supreme Court explained Proposition 209's effect on a challenged city contracting program that had been designed "to encourage public works projects participation by minority business enterprises (MBEs) and women business enterprises (WBEs)."[14] The Court found this practice impermissible under Proposition 209, notwithstanding that the city sought to favor the target groups rather than to prejudice them.[15] Neither did it matter that the city labeled its objectives as "participation goals" rather than "quotas."[16] Finally, the Court rejected the city's argument that section 31 should be construed to permit any "remedial" race-conscious programs that would be allowable under the Equal Protection Clause of the United States Constitution. The Court acknowledged that, under federal equal protection analysis, discrimination and preferential treatment have been found to be permissible when they are "justified by a compelling state interest and are narrowly tailored to address an identified remedial need."[17] But the Court determined that California, by adopting section 31, has forbidden even those forms of "affirmative" discrimination.[18] *Page 7 
Having in mind this "categorical prohibition" against preferential treatment by the state in public employment and public contracting, we look more closely at TEROs.
Tribal Employment Rights Ordinances
Federally recognized Indian tribes occupy a unique position in the United States, retaining many features of sovereignty with respect to their tribe members and tribal land. And, as the United States Supreme Court has often observed, the regulation of Indian affairs is the province of the federal government.[19]
Under present law, federally recognized tribes[20] are authorized to adopt and enforce TEROs.[21] And, with regard to federally supported highway construction projects, [22] Congress has expressly permitted "the preferential employment of Indians living on or near a reservation on projects and contracts on Indian reservation roads," and has authorized states, at their option, to implement such Indian hiring preferences for highway work conducted on or near Indian reservations:
 Consistent with section 703(i) of the Civil Rights Act of 1964 (42 U.S.C. 2000e-2 (i)), nothing in this section shall preclude the preferential employment of Indians living on or near a reservation on projects and contracts on Indian reservation roads. States may implement a preference *Page 8 for employment of Indians on projects carried out under this title near Indian reservations. The Secretary shall cooperate with Indian tribal governments and the States to implement this subsection.[23]
However, adoption of TERO Indian employment preferences by participating states is permissive, not mandatory. That is, a tribe lacks jurisdiction to impose its TERO hiring preference requirements upon an unwilling state or its officials, at least with regard to highway construction work performed on rights of way owned by the state.[24] As the court explained in Montana Department of Transportation:
 [C]ourts have recognized tribal civil regulatory authority over tribal members as part of a tribe's retained sovereignty. Indian tribes also retain some power to regulate non-tribal members engaged in activity on reservation land. Tribal power, however, is circumscribed over reservation land owned in fee by non-Indians and over reservation land in which non-Indians have acquired property rights substantial enough to be considered "land alienated to non-Indians," such as easements and rights of way. See Strate v. A-1 Contractors, 520 U.S. 438, 445 (1997). In sum, "[the] exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express *Page 9 
congressional delegation." Montana v. United States, 450 U.S. 544, 564 (1981). Thus, Montana's main rule is that absent a treaty or a federal law, a tribe has no civil regulatory authority over non-tribal members for activities on reservation land alienated to non-Indians.[25]
A tribe's power to tax nonmembers' activities within such easements and rights of way is similarly restricted. A tribe may impose taxes in such circumstances only under the two narrowly construed exceptions articulated in Montana v. United States[26] — that is, only when either (1) the tax is imposed on activities authorized by, and is commensurate with, a consensual relationship, or (2) the tax is required to protect the tribe's internal political integrity.[27]
We are aware of no federal statute expressly authorizing tribes to impose TERO fees or taxes on highway projects carried out on Indian land. Thus, Congress has evidently enacted no legislative "taxation" authorization equivalent to the "preferential employment" authorization embodied in 23 U.S.C. § 140(d).
The Federal Perspective
Federal treatment of Indian hiring preferences is illuminating. In the limited circumstance of work performed within the boundaries of an Indian reservation, insofar as federal anti-discrimination laws are concerned, we are persuaded that courts would be untroubled by a tribe's adoption of TERO Indian hiring preferences or by incorporation of those preferences by state employers operating on Indian land. Indeed, as we've noted, state participation in the Indian hiring preference provided in a TERO is expressly authorized by federal law.[28] Preferential hiring programs that are intended to expand job training and employment opportunities for Indian workers promote vital tribal interests in the health, welfare, and financial well-being of the tribe's members, and in the tribe's self-sufficiency, thereby strengthening tribal self-government.[29]
When permitted under *Page 10 
federal law, however, such a preferential scheme has related to work connected with tribal land or with tribal governance.
We also believe that such hiring preferences would be found permissible under the Equal Protection Clause of the Fourteenth Amendment as reflecting a "political" rather than a "racial" classification. In Mortonv. Mancari, the Court considered whether a federal Indian hiring preference for the Bureau of Indian Affairs amounted to invidious discrimination prohibited by the Fifth Amendment. In rejecting the claim, the Court noted, among other things, that the hiring preference was "not even a `racial' preference, because it was limited to members of federally recognized tribes. Said the Court: "This operates to exclude many individuals who are racially to be classified as `Indians.' In this sense, the preference is political rather than racial in nature."[30]
Could a state-implemented preference limited to enrolled members of federally recognized tribes similarly be classified as a "political" rather than "racial" classification for Fourteenth Amendment purposes? We believe so.
In Artichoke Joe's California Grand Casino v. Norton, [31] the Ninth Circuit considered an equal protection challenge to California's Proposition 1A, an initiative constitutional amendment that gave to California's Indian tribes the unique prerogative of operating gambling casinos that are prohibited elsewhere in the state.[32] InvokingMancari, the court upheld the measure, reasoning thusly: "[W]hen a state law applies in Indian country as a result of the state's participation in a federal scheme that `readjusts' jurisdiction over Indians, that statelaw is reviewed as if it were federal law. If rationally related to both Congress' trust obligations to the Indians and legitimate state interests, the *Page 11 
state law must be upheld."[33] The court found that the Indian Gaming Regulatory Act (IGRA) is "a federal law explicitly designed to readjust the regulatory authority of various sovereigns over . . . the lands of federally recognized Indian tribes."[34] Artichoke Joe's is significant in that the "application" of state law to Indian lands as a result of Proposition 1A was, in fact, an exemption from state laws that forbid casino-style gambling elsewhere in the state, resulting in the ability of Indian tribes uniquely to conduct forms of gambling that are expressly forbidden to others.[35] Furthermore, it was an exemption that IGRA did not require in order to effectuate Congress's purposes.[36] Thus, for purposes of equal protection analysis, Proposition 1A was treated as if it were a federal law because Proposition 1A was enacted "in response to" or "in reference to" IGRA.[37]
In this case, the Department's implementation of an Indian hiring preference would clearly be "in response to" and "with reference to" Congress's program for advancing tribal economic development and self-sufficiency.[38] The hiring preferences at issue here are limited to enrolled members of federally recognized tribes. Moreover, the Department's implementation of these hiring preferences is at the express invitation of the federal government.[39] We are satisfied that a court would accept the Indian hiring *Page 12 
preference at issue here as a "political," rather than "racial" classification, permissible under the Fourteenth Amendment as justified by a rational governmental purpose.
Our primary focus in this opinion, however, is on state law rather than federal law. Assuming, as we do, that the Indian hiring preference at issue here would satisfy federal equal protection guarantees, would it nevertheless run afoul of Proposition 209?[40] Further, may the affected tribes impose a TERO tax on the state and its contractors and subcontractors?
Question 1
The first question asks whether Proposition 209, Cal. Const., art. I, § 31, prohibits the Department from incorporating a tribe's TERO hiring preferences in its contracts, thus requiring the Department's contractors and subcontractors to follow such TERO practices where the state's road work is performed on stretches of highway passing through Indian reservations. We believe that the section 31 prohibition does not apply in these circumstances.
Although Mancari and its progeny are not dispositive of the state-law issue, we believe those cases are significant in that they treat membership in federally recognized Indian tribes as a "political" classification rather than a racial or ethnic classification. We believe that, in the narrow context presented here, a TERO hiring preference may properly be characterized as a "political" classification not encompassed by the prohibitions of section 31.
Congress obviously anticipates that states, as well as the federal government, may deal with tribes on a government-to-government, basis.[41]
California law also recognizes *Page 13 
the quasi-sovereign status of Indian tribes, [42] and from time to time the Legislature has expressed its intent to deal with tribes on a government-to-government basis in furtherance of federal, state, and tribal interests.[43] Furthermore, this question comes to us in the context of highway projects that run through Indian lands over which a tribe exercises governmental authority. In this unique territory, there are obvious elements of homeland, sovereignty for Indians, and a federal interest in tribal economic development and advancing tribal self-government — factors which substantially inform our conclusions.
Within this context, we assume that the Department deals with the tribe on a government-to-government basis, [44] and we believe that, in so doing, a practice of respecting a tribal ordinance by extending hiring preferences to Indian employees[45] for *Page 14 
work performed in Indian country is fundamentally different from a policy favoring an ethnic or racial group. In these very limited circumstances, we believe that a tribe's prescription of Indian hiring preferences as an exercise of tribal governmental prerogative, and any cooperation therewith by a California governmental agency, may reasonably understood to be matters of political policy.[46] Moreover, the hiring preference here, like that in Mancari, is predicated upon membership in a federally recognized tribe, not merely upon Indian "racial" ancestry.[47] Taking all of these factors into consideration, *Page 15 
we believe that in the specific circumstances presented here, TERO preferences would properly be treated as "political" classifications for purposes of evaluation under section 31, as they would be for purposes of evaluation under the Fourteenth Amendment.
We emphasize, however, that our state's constitutional provision, like the federal Equal Protection Clause, would bar a California public agency from adopting or incorporating any general employment practices or policies giving advantages or preferences to Native American workers or applicants on the basis of Native American ancestry. The preferential scheme embodied in a TERO is valid under Proposition 209 because it is predicated (1) on a federal statutory invitation in furtherance of a federal interest, (2) on federal recognition of the affected tribe and that tribe's promulgation of a federally permissible implementing ordinance, (3) on the fact that the preference benefits only enrolled members of Indian tribes and not persons merely of Indian ancestry, and (4) on the fact that the preference is limited to federal-aid highway projects on state rights of way running through Indian lands over which the affected tribe exercises governmental authority. Under these circumstances, we believe that the hiring preference may fairly be described as "political" in nature and not a form of prohibited racial, ethnic, or national origin discrimination.[48] Accordingly, they would be valid as serving a legitimate governmental purpose.[49]
We conclude that Section 31 does not bar the Department from including Indian employment preferences in its contracts for these discrete projects. The Department is under no federal compulsion to incorporate such TERO preferences, but Proposition 209 does not prevent it from doing so as a matter of government-to-government relations.
Question 2
Having found that Section 31 poses no impediment to the Department's inclusion of valid TERO employment preferences in contracts for such projects, we next consider whether the Department has sufficient statutory authority to incorporate such *Page 16 
terms in its contracts.[50]
The Legislature has authorized the Department to speak for the state in matters of highway construction and maintenance.[51] The Department is authorized to deal directly with local governments[52] and with the federal government[53] in matters relating to that subject.[54]
Furthermore, state law expressly encourages and authorizes the Department "to cooperate with federally recognized California Indian tribes on matters of economic development and improvement for the tribes."[55] We believe that the broad powers vested in the Department include the authority to determine whether and to what extent the Department should cooperate with TERO provisions, as a matter of comity, when the Department carries out federal-aid highway projects in Indian country. The Legislature is free to enact statutory standards and restrictions governing the adoption of such preferences, of course, but in the absence of specific legislative direction we believe that the Department has discretion to decide what is the appropriate course of conduct. *Page 17 
Questions 3 and 4
Questions 3 and 4 ask whether tribes may impose their TERO taxes on the Department or its contractors when highway projects are located on state rights of way over Indian lands.
We assume for purposes of our analysis that all rights of way in question qualify as "land alienated to non-Indians,"[56] and that the controlling instruments of conveyance do not reserve for the tribes any specific taxing power or other right of dominion or control over the property. Based on that assumption, and because such taxes — levied upon persons who are not tribal members, for activities conducted on land alienated to non-Indians — are "presumptively invalid,"[57] we conclude that the Department and its contractors are not required to pay TERO taxes or fees.
We believe that neither of the narrow exceptions articulated in Montanav. United States[58] obtains in these circumstances. The Department's obligation to "improve and maintain the state highways"[59] — activities which are "clearly within the scope of the purpose of the right of way as well as the State's sovereign duty"[60] — do not establish consensual relationships that may be said to contemplate or expressly permit commensurate taxation. And, while revenues generated by a TERO tax concededly support important tribal objectives, we are aware of nothing in the highway projects themselves that would threaten tribes' internal political operations or their sovereignty.[61] Hence, any attempt by the tribes to assert authority over the state's projects "goes beyond the `internal functioning of the tribe and its sovereignty'" and "instead impinges on one of [the state's] sovereign responsibilities — namely, maintaining [the highway] and the right of way at its own expense."[62] We therefore conclude that federally recognized Indian tribes cannot require the Department or its contractors to pay TERO fees or taxes for highway work projects performed on roads located within Department rights of way *Page 18 
on tribal lands.[63]
On the other hand, we do not go so far as to conclude that the voluntary payment of TERO fees would necessarily be a "gift" of public funds, which is prohibited by the California Constitution.[64] The general rule is that the Legislature cannot make, or authorize any agency to make, a gift of public funds — which would appear to prohibit the Department from paying TERO taxes, because TERO taxes are unenforceable against the state. "To this general rule, however, there is a well recognized exception. It has been consistently held that expenditures of public funds . . . are not gifts within the meaning of the constitutional prohibition if those funds are expended for a public purpose."[65] The determination of what constitutes a public purpose is primarily a matter for the Legislature to decide, and the Legislature's decision will not be disturbed by the courts as long as it is reasonable.[66] We have little doubt that the Legislature's discretion would be upheld if it were to determine that it would serve a public interest to pay TERO taxes under the kinds of circumstances at issue here.[67]
Nor is it only the Legislature that has the power to make discretionary decisions about the expenditure of funds. It has long been recognized that the gift prohibition does not bar an administrative agency from making expenditures that promote a legitimate *Page 19 
public purpose within its purview, even if the expenditures provide some incidental benefit to private persons.[68] We note, however, that the purposes and powers that the Legislature has entrusted to the Department are broad and varied, [69] and that the Department is entitled to considerable latitude in making discretionary expenditures.[70]
Whether the payment of TERO fees under any particular set of circumstances would promote a legitimate public interest is a question that goes beyond the scope of this opinion. Among the many factors that we believe would be appropriate for consideration, however, are the extent to which a project impacts the condition or use of land outside of the right of way; the burden that a project imposes on tribal services such as safety personnel or administrative review procedures; and the extent to which TERO fees would be used to support a tribe's own transportation-related activities, such as those that would constitute allowable uses of federal Indian Reservation Roads program funds.[71] *Page 20 
We therefore conclude that, while federally recognized Indian tribes cannot require the Department or its contractors to pay TERO fees or taxes for highway work projects performed on roads located within Department rights of way on tribal lands, voluntary payment of such fees or taxes would not violate the State Constitution if the payment served a legitimate public purpose.
 *****
[1] See Govt. Code §§ 14000-14456.
[2] Parcels of land within the outer boundaries of Indian reservations or rancherias may not always be entirely reserved for or controlled by the tribe, but rather may be a "checkerboard" of, among other things, tribal land, trust land, and land held in fee by Indians or non-Indians.See, e.g., Mont. v. U.S., 450 U.S. 544, 547-548 (1981). Further, the terms "Indian reservation," "Indian country," and "tribal land" may carry different meanings in different contexts. Compare 23 U.S.C. § 101 (2008) ("Indian reservation road") with 25 U.S.C. § 1452(d) (1988) ("reservation") and with 18 U.S.C. § 1151 (1949) ("Indian country"). In this opinion, these terms all denote territory over which federally recognized tribes retain some degree of tribal sovereignty.
[3] 23 U.S.C. § 140(d).
[4] With regard to rights of way and easements, we note that the respective state and tribal property rights may turn on the particular terms of the actual rights of way involved. See Strate v. A-1Contractors (Strate), 520 U.S. 438, 455-456 (1997); Mont. Dept.of Transp. v. King, 191 F.3d 1108, 1113, n. 1 (9th Cir. 1999). However, consideration of such specific easement provisions or right of way terms is beyond the scope of this opinion. For purposes of our analysis, we assume that the Department's rights of way here, as in Strate,520 U.S. at 445, 456 and Mont. Dept. of Transp., 191 F.3d at 1112-1113, convey property rights substantial enough to qualify the affected properties as "land alienated to non-Indians."
[5] For purposes of our analysis, we assume that the term "Native American" or "Indian" has the same meaning as the term "Indian" in federal law, i.e., an enrolled member of a federally recognized Indian tribe. See e.g., 25 U.S.C. § 450b (d), (e) (defining "Indian" and "Indian tribe," respectively).
[6] See, e.g., Mont. Dept. of Transp., 191 F.3d at 1111 (describing TERO terms); FMC v. Shoshone-Bannock Tribes, 905 F.2d 1311, 1312-1313
(9th Cir. 1990) (same).
[7] We are aware that TERO provisions may vary widely from tribe to tribe, given that each tribe decides for itself whether to promulgate a TERO in the first place and, if so, what terms the ordinance should include. Consideration of specific tribal ordinances is beyond the scope of this opinion.
[8] This opinion assumes that any tribal employment preference under discussion would be permissible under federal law. See 23 U.S.C. § 140(d) (2005) (permitting "the preferential employment of Indians living on or near a reservation on projects and contracts on Indian reservation roads" (italics added)); 23 C.F.R. § 635.117(d) (2008) ("Indian preference shall be applied without regard to tribal affiliation or place of enrollment"); cf. Dawavendewa v. Salt River Project Agr. Imp. and PowerDist., 154 F.3d 1117, 1120-1124 (9th Cir. 1998) (preference for members of a specific tribe constitutes national origin discrimination in violation of Title VII of the federal Civil Rights Act and is not permitted under "Indian preferences" exemption).
[9] See generally Hi-Voltage Wire Works, Inc. v. City of San Jose,24 Cal. 4th 537 (2000); CC Constr., Inc. v. Sacramento Mun. Util.Dist., 122 Cal. App. 4th 284 (2004); Connerly v. State Personnel Bd.,92 Cal. App. 4th 16 (2001).
[10] We note that the California Constitution also contains a broader prohibition against discrimination in employment opportunities. Section 8 of article I provides:
 A person may not be disqualified from entering or pursuing a business, profession, vocation, or employment because of sex, race, creed, color, or national or ethnic origin.
See, e.g., Phillips v. St. Mary Regl. Med. Ctr., 96 Cal. App. 4th 218,230 (2002) (section 8 "reflects fundamental and firmly established public policy against employment discrimination based on certain classifications including race and sex").
[11] 81 Ops.Cal.Atty.Gen. 233, 238 (1998).
[12] Cal. Const. art. I, § 31(a). Contractors performing public works projects for the state are similarly restricted from engaging in employment discrimination. See Pub. Cont. Code § 1101 (defining "public works contracts" as, inter alia, agreements for the construction, repair, or improvement of any public road); § 10128 (such contracts must comply with standards set forth in Lab. Code § 1720, et seq., regarding public works contracts); Lab. Code § 1735 (public works contractors shall not discriminate on any basis listed in Govt. Code § 12940(a), i.e., "race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, age, or sexual orientation").
[13] Hi-Voltage Wire Works, Inc. v. City of San Jose, 24 Cal. 4th 537
(2000).
[14] Id. at 542.
[15] Id. at 559-560 (internal citations and footnotes omitted).
[16] Id. at 563 (internal citations omitted). See also San FranciscoFirefighters v. City and Co. of San Francisco, 38 Cal. 4th 653, 676
(2006) ("in approving Proposition 209, the voters intended section 31, like the Civil Rights Act as originally construed, `to achieve equality of [public employment, education, and contracting] opportunities' and to remove `barriers [that] operate invidiously to discriminate on the basis of racial or other impermissible classification'") (internal citations omitted).)
[17] Hi-Voltage, 24 Cal. 4th at 567.
[18] Id.
[19] See California v. Cabazon Band of Mission Indians, 480 U.S. 202,207-208 (1987) (citing U.S. v. Mazurie, 419 U.S. 544, 557 (1975) andWash. v. Confederated Tribes of Colville Indian Reservation, 447 U.S. 134,154 (1980)); see also Rice v. Rehner, 463 U.S. 713, 718 (1983) (tribal sovereignty, while unique and limited in character, is subordinate only to federal government, not to states); Morton v. Mancari (Mancari),417 U.S. 535, 551-552 (1974) (Congress, based on its assumption of "guardian-ward" status and on history of treaties, has plenary power to legislate on behalf of federally recognized Indian tribes).
[20] For purposes of this opinion, the discussion of tribal lands, tribal rights, and tribal ordinances is restricted to tribes formally recognized by the federal government that have tribal land in California. See 73 Fed. Reg. 18553-01 (Apr. 4, 2008) (listing tribal entities recognized by federal government).
[21] See, e.g., Mont. Dept. of Transp., 191 F.3d at 1111-1113; FMC,905 F.2d at 1312-1313.
[22] See Federal-Aid Highway Act, 23 U.S.C.A. § 101, et seq. (2008).
[23] 23 U.S.C. § 140(d) (italics added); see 23 C.F.R. § 635.117(d) (2008). Section 703(i) of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-2 (i)) permits preferential treatment of Indian employees for employment conducted "on or near an Indian reservation" notwithstanding that Act's general prohibition against such preferences:
 Nothing contained in this subchapter shall apply to any business or enterprise on or near an Indian reservation with respect to any publicly announced employment practice of such business or enterprise under which a preferential treatment is given to any individual because he is an Indian living on or near a reservation.
Cf. 42 U.S.C. at § 2000e-2(a)(1) (generally prohibiting employment discrimination or preferences based on an individual's "race, color, religion, sex, or national origin"); 23 U.S.C. § 140(a) (2005) (general nondiscrimination rule for federal highway projects, requiring participating states to provide assurances "that employment in connection with proposed projects will be provided without regard to race, color, creed, national origin, or sex").
[24] See Mont. Dept. of Transp., 191 F.3d at 1115.
[25] Id. at 1112-1113 (footnote and some internal citations omitted).
[26] Mont. v. U.S., 450 U.S. at 564.
[27] Atkinson Trading Co., Inc. v. Shirley, 532 U.S. 645, 659 (2001) (tribe's "imposition of tax upon nonmembers on non-Indian fee land within reservation is . . . presumptively invalid"); see also, e.g., Big HornCo. Elec. Coop. v. Adams, 219 F.3d 944, 949-952 (9th Cir. 2000);Burlington N. R.R. Co. v. Red Wolf, 196 F.3d 1059, 1064 (9th Cir. 1999).
[28] 23 U.S.C. § 140(d).
[29] Cf. Mancari, 417 U.S. at 555 (BIA employment preferences for Native Americans are "designed to further Indian self-government").
[30] Mancari, 417 U.S. at 554 and n. 24. We note also that the Supreme Court's decision in Rice v. Cayetano, 528 U.S. 495, 519-520 (2000) left open the possibility that a state-implemented hiring preference benefitting enrolled members of federally recognized tribes would be permissible under the Fourteenth Amendment, while striking down Hawaii's voting preference for native Hawaiians. See also Malabed v. North SlopeBorough, 335 F.3d 864, 868 n. 5 (9th Cir. 2003) (state subdivision's ordinance establishing borough-wide Native American hiring preference, unrelated to tribal lands or any specific federal interest, violates state constitution's equal protection clause).
[31] Artichoke Joe's California Grand Casino v. Norton, 353 F.3d 712, 736
(9th Cir. 2003).
[32] See Cal. Const. art. IV, § 19(f).
[33] Artichoke Joe's, 353 F.3d at 734 (italics added).
[34] Id. at 736.
[35] Compare Cal. Const. art. IV, § 19(e) ("The Legislature . . . shall prohibit[] casinos of the type currently operating in Nevada and New Jersey") and Pen. Code § 330a (prohibiting, among other things, slot machines) with Cal. Const. art. IV, § 19(f) (notwithstanding subdivision (e), "slot machines, lottery games, and banking and percentage card games are hereby permitted to be conducted and operated on tribal lands. . . .").
[36] See Rumsey Indian Rancheria of Wintun Indians v. Wilson64 F.3d 1250, 1258 (9th Cir. 1994) (under IGRA "a state need only allow Indian tribes to operate games that others can operate, but need not give tribes what others cannot have"); see also Hotel Employees and RestaurantEmployees Intern. Union v. Davis, 21 Cal. 4th 585, 611-612 (1999) (IGRA does not preempt state Constitution's ban on casino-style gaming).
[37] Artichoke Joe's, 353 F.3d at 736.
[38] See id. (citing Alaska Chapter, etc. v. Pierce, 694 F.2d 1162, 1170
(9th Cir. 1982) ("the furtherance of `an economic community' on Indian lands [is] a goal related to Congress' special trust obligations.").
[39] 23 U.S.C. § 140(d). Indeed, this express invitation to the states to participate in this Indian hiring preference program is some indication of Congress's belief that state participation should not be construed to effect a prohibited "racial classification" in violation of the Fourteenth Amendment.
[40] Section 31 does include an express exception, set forth in subdivision (e), for an "action which must be taken to establish or maintain eligibility for any federal program, where ineligibility would result in a loss of federal funds to the state." But, as we have seen, a state's compliance with TERO hiring preferences is discretionary, not compulsory, under federal law, and a state's choice in this respect has no effect on its continuing eligibility for federal highway construction funds. 23 U.S.C. § 140(d); 23 C.F.R. § 635.117(d); see Mont. Dept.of Transp., 191 F.3d at 1108. Hence, this exception does not apply to our circumstances.
[41] See, e.g., Allen v. Gold Country Casino, 464 F.3d 1044, 1046 (9th Cir. 2006) (tribal-state gaming compacts pursuant to25 U.S.C. § 2710(d)(1)).
[42] See Agua Caliente Band of Cahuilla Indians v. Super. Ct.,40 Cal. 4th 239, 247 (2006); In re M.M., 154 Cal. App. 4th 897, 908
(2006).
[43] See Gov. Code § 12012.5(g) (recognizing government-to-government relationship as basis for tribal-state gaming compacts); Stats. 2004, ch. 905, § 1(b)(3) ("In recognition of California Native American tribal sovereignty and the unique relationship between California local governments and California tribal governments, it is the intent of the Legislature, in enacting this act, to . . . (3) Establish government-to-government consultations. . . ."); see also Pen. Code § 830.8
(recognizing peace-officer powers of Washoe Tribe law enforcement officers).
[44] Congress contemplates that, with respect to the conduct of casino-style gambling, California's relationship with all of the federally recognized tribes in the state is one of government-to-government. See 25 U.S.C. § 2710(d)(3)(A); see Allen v.Gold Country Casino 464 F.3d at 1046. At present, California has entered into some 67 compacts with Indian tribes in California, and 57 tribes are operating casinos pursuant to those compacts. See website of the California Gambling Control Commission at http://www.cgcc.ca.gov/compacts.asp (as of October 21, 2009). We would expect, then, that the Department would deal with California's federally recognized Indian tribes on a government-to-government basis even with respect to matters unrelated to gaming.
[45] A tribe's governmental jurisdiction may extend to all enrolled Indians within the tribe's reservation, even if the Indians are members of other tribes. See 25 U.S.C. § 1301; Means v. Navajo Nation,432 F.3d 924, 934 (9th Cir. 2005) (Navajo Tribe had criminal jurisdiction over defendant member of the Oglala-Sioux Indian Tribe). However, as we noted earlier, federal law would preclude the Department from favoring one tribe over another. 23 C.F.R. § 635.117(d) (2008) ("Indian preference shall be applied without regard to tribal affiliation or place of enrollment"); See Dawavendewa v. Salt River Project Agr. Imp. andPower Dist., 154 F.3d at 1120-1124.
[46] A different question would be presented were a state agency to implement a wholly self-initiated Indian hiring preference. Here, the Department is responding to a tribe's exercise of governmental power in the form of an ordinance, and it is this circumstance, among others we have discussed, that supports our view that the Department's action is a matter of government-to-government policy.
[47] As one commentator has observed:
 Under federal constitutional law, classifications turning on a person's membership in an Indian tribe are generally not seen as being based on race or national origin. Because an Indian tribe is not just an ethnic group but a political one, the Court has viewed "preference[s]" for "members of federally recognized tribes" as "political rather than racial in nature." [Citing Mancari, 417 U.S. at 553 n. 24.] This makes sense. The government sorts us by political allegiance in various ways: it sometimes distinguishes U.S. citizens from aliens, and Californians from out-of-state citizens. An Indian tribe is likewise a different sovereign. Tribal Indians, unlike other Californians, belong to a political group that's specifically recognized by federal law and the U.S. Constitution, not merely to an ethnic group that has no independent legal standing.
Eugene Volokh, The California Civil Rights Initiative: An InterpretiveGuide, 44 UCLA L. Rev. 1335, 1358-1359 (1997).
Indeed, courts have recognized that membership in a tribe and Indian ancestry are not necessarily coextensive concepts. Tribes have the sovereign power to exclude even "racially" Native American persons from tribal membership. See Santa Clara Pueblo v. Martinez, 436 U.S. 49 (1978) (no federal subject matter jurisdiction over disputes involving tribal law excluding children of female members who married outside the tribe while extending membership to children of male members who married outside the tribe); Quair v. Sisco, 359 F. Supp. 2d 948, 979-980
(E.D. Cal. 2004) (court without jurisdiction to review tribe's disenrollment of petitioners); cf., Means v. Navajo Nation,432 F.3d at 934, (Navajo Tribe's criminal jurisdiction over defendant was predicated, not upon defendant's Indian ancestry, but upon his political affiliation with (i.e., enrolled membership in) the Oglala-Sioux Indian Tribe).
[48] Cf., Malabed v. North Slope Borough, 730 P.3d 416 (Alaska 2003),relied on in Malabed v. North Slope Borough, 335 F.3d 864, 868 (9th Cir. 2003) (state subdivision's ordinance establishing borough-wide Native American hiring preference, unrelated to tribal governance or culture or land, violates state constitution's equal protection clause).
[49] See Gov. Code § 11019.8(a) "All state agencies . . . are encouraged and authorized to cooperate with federally recognized California Indian tribes on matters of economic development and improvement for the tribes."
[50] We understand this question to concern state statutes, since federal statutes clearly authorize states to implement such preferences.23 U.S.C. § 140(d); 42 U.S.C. §§ 2000e (b) and 2000e-2(i);23 C.F.R. § 635.117(d); see Washington v. Confederated Bands,439 U.S. 463, 734, 761 (1979) (although states lack Congress's unique relationship with Indians, Congress may authorize states to carry out elements of federal trust responsibility).
[51] See, e.g., Sts. High. Code § 90 (Department has "full possession and control of all state highways and all property and rights in property acquired for state highway purposes"); Sts. High. Code § 94 (Department "may make and enter any contracts in the manner provided by law that are required for performance of its duties); Sts. High. Code § 137 (Department "shall determine the kind, quality, and extent of all highway work done under its control"). See also Pub. Cont. Code § 10295
(contracts authorized by Streets and Highways Code not subject to review and approval by Department of General Services); Hilltop Properties v.State of California, 233 Cal. App. 2d 349, 367 (1965) (Department has right "to enter into contracts and to acquire property which it considers necessary for state highway purposes," and may determine "the procedure to be utilized in making such contracts").
[52] Sts. High. Code §§ 113.5, 114, 130.
[53] Sts. High. Code §§ 109.5, 130.5.
[54] Cf. Sts. High. Code §§ 70-86 (powers and duties of California Transportation Commission).
[55] Gov. Code § 11019.8(a).
[56] Strate, 520 U.S. at 445, 456; see Mont. Dept. of Transp.,191 F. 3d at 1112-1113.
[57] Atkinson Trading Co., Inc., 532 U.S. at 659; see Big Horn Co.Elec. Coop., 219 F.3d at 949-952; Burlington N. R.R. Co.,196 F.3d at 1064.
[58] Mont. v. U.S., 450 U.S. at 564.
[59] Sts. High. Code § 91.
[60] Mont. Dept. of Transp., 191 F.3d at 1113.
[61] Id. at 1113-1115; see Strate, 520 U.S. at 459.
[62] Mont. Dept. of Transp., 191 F.3d at 1114.
[63] With our conclusion we voice our hope that the Department and the tribes will continue to work amicably together, and that any disagreements that may arise in regard to highway projects on tribal land will be addressed with mutual respect and appreciation for the respective sovereign interests involved. The court's closing comments in Mont.Dept. of Transp., 191 F.3d at 1115, provide valuable insight in this respect, noting that the judicial forum is not well suited to "resolving difficulties between Indian tribes and States," and that "solutions to these problems rest with the political branches of each sovereign." We share the court's optimism that the parties will work together to craft mutually satisfactory solutions.
[64] Article XVI, section 6 of the California Constitution states, "The Legislature shall have no power . . . to make any gift or authorize the making of any gift, of any public money or thing of value to any individual, municipal or other corporation whatever. . . ."
[65] Preston v. State Bd. of Equalization, 25 Cal. 4th 197, 225 (2001) (quoting Schettler v. Co. of Santa Clara, 74 Cal. App. 3d 990, 1003
(1977)).
[66] Id.
[67] Cf. Govt. Code § 11019.8(a) ("All state agencies . . . are encouraged and authorized to cooperate with federally recognized California Indian tribes on matters of economic development and improvement for the tribes.")
[68] E.g., Edgemont Community Servs. Dist. v. Moreno Valley,36 Cal. App. 4th 1157, 1164-1165 (1995); Ransom v. Los Angeles CityHigh Sch. Dist., 129 Cal. App. 2d 500, 506 (1954);88 Ops.Cal.Atty.Gen. 213, 215 (2005).
[69] See Govt. Code §§ 14000, 14000.5 (expressions of legislative intent); 14002, 14005 (broad powers vested in Director of Department to carry out legislative purposes); 14030 (general powers and duties of Department); see also id. at §§ 14130-14136 (granting department flexibility in contracting for professional services); see generally id.
at § 11019.8(a) ("All state agencies . . . are encouraged and authorized to cooperate with federally recognized California Indian tribes on matters of economic development and improvement for the tribes.").
[70] City of Pasadena v. Dept. of Transp., 29 Cal. App. 4th 1280,1294 (1994).
[71] The Indian Reservation Roads program is a federal highway program established to address the transportation needs of tribes, and can include the kinds of federal-aid highway projects over tribal lands that are the subject of this opinion. 23 U.S.C. § 204. Federal regulations identify a wide variety of allowable uses of Indian Reservation Roads program funds — specifically including TERO fees, and including uses as diverse as planning, design, construction, and improvement of roads and transit facilities; traffic control in construction zones; costs associated with permitting and public hearings; environmental mitigation and conservation; traffic safety improvement projects; on-the-job education in traffic planning and highway construction; technology improvement for traffic planning and highway construction; and financial assistance for persons and businesses displaced by road projects. (See25 C.F.R., Pt. 170, app. A (2008).) Whether or not a given project administered by the Department includes any of these federally-approved elements, or is supported by federal Indian Reservation Roads program funds, we believe that the federal regulations standing alone demonstrate that these kinds of programs may reasonably be regarded as serving legitimate public purposes. *Page 1